**COOLSPRING STONE SUPPLY, INC., Appellant**

v.

**AMERICAN STATES LIFE INSURANCE COMPANY.**

No. 93–3170.

United States Court of Appeals, Third Circuit.

Argued Nov. 3, 1993.

Decided Nov. 24, 1993.

---

Gregg M. Rosen (argued), Robert G. Bello, Sable, Makoroff & Gusky, Pittsburgh, PA, for appellant.

Wendelynne J. Newton (argued), Anthony J. Guida, Jr., Buchanan Ingersoll Professional Corp., Pittsburgh, PA, for appellee.

Before: SLOVITER, Chief Judge, STAPLETON, Circuit Judge, and RESTANI *, Judge, United States Court of International Trade.

* Hon. Jane A. Restani, sitting by designation.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

 Plaintiff Coolspring Stone Supply, Inc., the beneficiary of an insurance policy on the life of one of its principals, appeals from a grant of summary judgment in favor of the insurer, defendant American States Life Insurance Company. Our standard of review on an appeal from a grant of summary judgment is plenary. *See Metro Transp. Co. v. North Star Reinsurance Co.*, 912 F.2d 672, 678 (3d Cir.1990). We review the facts in the light most favorable to the party against whom summary judgment was entered. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988).

## I.

Coolspring was a closely-held corporation with three shareholders who each owned one-third of the stock. App. at 192. Louis Hamo was one of those shareholders. App. at 190. Hamo applied[1] for a life insurance policy from American States in December 1989, App. at 169, naming Coolspring as the owner and beneficiary of the policy, App. at 166, which was issued in January, 1990. App. at 160. Coolspring also purchased similar policies for its two other shareholders, which would enable the corporation to fund its agreement to purchase the shareholders' stock from their families on the death of the shareholder. App. at 194, 461–62.

Hamo died in September, 1991.[2] American States refused to pay on the $1 million policy, asserting that Hamo had made material misrepresentations in the application.

Coolspring brought suit in a Pennsylvania state court in February 1992 to recover on the policy. American States removed the case to the United States District Court for the Western District of Pennsylvania and defended on the ground that Hamo had made fraudulent, material misrepresentations in the application and, therefore, the policy was void *ab initio*.

American States maintained that Hamo made three misrepresentations in his application. Hamo stated that he did not have a liver disease or disorder when allegedly he had cirrhosis or, at least, a fatty liver.[3] Additionally, he allegedly misrepresented the amount of alcohol he drank by denying that he drank excessively.[4] Finally, he denied having had some blood tests, when in fact those tests showed abnormal results related to alcohol and his liver.[5] App. at 279, 746.

Pretrial matters were assigned to a magistrate judge, and extensive discovery was pursued. Thereafter, both parties moved for summary judgment. Coolspring argued, *inter alia*, that Hamo had not made any misrepresentations or that, at least, he had not knowingly done so. The magistrate judge issued a report and recommendation recommending summary judgment in favor of

---

1. There seemed to be some argument between the parties in the district court as to whether Hamo or Coolspring "applied" for the policy. Hamo signed the application and swore to the truth of the statements, and Coolspring does not contest that it is bound by Hamo's conduct.

2. The cause of death was listed on the death certificate as "(a) [c]ardiopulmonary arrest (b) [a]noxic encephalopathy [and] (c) [h]epatic encephalopathy." App. at 442. American States asserts that the death was brought on by cirrhosis of the liver.

3. The relevant portions of the application are:

 19. In the past ten years have you ever had or been told you had ... [u]lcer, indigestion, colitis, hernia, bleeding, or any disorder of the esophagus, stomach, intestines, rectum, gall bladder, or liver?
 [Answer] Yes. Had gall bladder removed 1984.

App. at 37.
 13. To the best of your knowledge and belief have you ever had or been told that you had ... stomach or duodenal ulcer, any disease or disorder of the stomach, intestines or bowel, rectum, appendix, liver, gall bladder, pancreas or spleen?
 [Answer] Yes. Nov 6/85—cholecystectomy for cholecystitis [gall bladder removal]....
App. at 38.

4. The relevant portion of the application:

 10. In the past 5 years have you ... used alcoholic beverages to excess or intoxication?
 [Answer] No.
App. at 38.

5. The application asked if during the past five years Hamo had, *inter alia*, any "blood studies, or other diagnostic tests." In his application, Hamo did not mention blood tests taken of him in December 1987. App. at 38.

American States. This was based on the magistrate judge's finding that Hamo "was aware of both an alcohol and a liver condition at the time he applied for the policy" and that Hamo's denials in the policy application were material and constituted fraudulent misrepresentations.

The district court adopted the magistrate judge's report in full without discussion. Coolspring appeals.

## II.

### A. *De novo review*

■ Coolspring argues that the district court did not do a proper *de novo* review of the magistrate judge's report as required by 28 U.S.C. § 636(b)(1).[6] A *de novo* review requires, at least, reading the transcripts of the testimony that relates to the objected-to portions of the magistrate's report. *See Hay v. Waldron*, 834 F.2d 481, 487 (5th Cir.1987). Coolspring argues that we should hold that the district court did not do a *de novo* review because it would have been physically impossible to have done so in the less–than–24–hour period between receiving Coolspring's objections and issuing its order.[7] Because

6. 28 U.S.C. § 636(b)(1) (1988) provides:

 [A] judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for ... summary judgment.... A judge ... shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.

7. Coolspring relies, *inter alia*, on *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir.1990), where the court stated that the district court could not possibly have done a *de novo* review in the four days between its receipt of the 60 pages of objections and its adoption of the magistrate judge's report where the hearing before the magistrate judge took six days and produced a six-volume transcript. Significantly, however, the district court had also applied the wrong standard of review.

 The other cases Coolspring cites which found on circumstantial evidence that the district court had not made a *de novo* review are inapposite here because in those cases it would have been impossible for the court to have reviewed the record because of the absence of transcripts. *See, e.g., Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir.1989).

we dispose of this appeal on other grounds, we need not reach this argument.

### B. *Incontestability Clause*

■ Coolspring also argues that American States has not proven that there was an incontestability clause in the policy covering Hamo, as required by Pennsylvania insurance law.[8] *See* Pa.Stat.Ann. tit. 40, § 510 (1992). The statute requires that every life insurance policy include a provision that after a policy has been in effect for two or more years, the insurer can no longer challenge the validity of the policy on any ground other than non-payment of premiums.[9] In the alternative, the insurer can include a provision more favorable to policyholders.

Coolspring argues that because an insurer must include an incontestability clause in its policy, and because American States failed to do so, the policy must be construed as being more favorable to the policyholder by precluding American States from challenging the policy on misrepresentation grounds at any time.

We find no support for this argument. Apparently there is no Pennsylvania precedent directly on point. In another context involving the failure to include a clause

8. Coolspring sent the original policy to American States with its claim. There is some dispute whether the document later produced by American States as the original is genuine. The problem arose because a copy of the policy that Coolspring later obtained did not contain the pages including the incontestability clause which is ordinarily on the reverse side of one of the policy pages.

 It is likely that the policy did include an incontestability clause, but the question is moot because we find the legal argument to be without merit. We address the legal argument to avoid confusion of issues and wasteful litigation on remand on the existence or nonexistence of the incontestability clause.

9. The relevant language of the statute is:

 No policy of life ... insurance ... shall hereafter be delivered ... unless it contains, in substance, the following provisions or provisions ... more favorable to the policyholder:— ...
 (c) A provision that the policy shall be incontestable after it has been in force, during the lifetime of the insured, two years from its date of issue, except for nonpayment of premiums.
 Pa.Stat.Ann. tit. 40, § 510 (1988).

meant to benefit the insureds that was required by the Pennsylvania insurance law, the Pennsylvania Superior Court interpreted the policy as incorporating the missing clause. *See Neel v. Williams,* 158 Pa.Super. 478, 45 A.2d 375, 377 (1946) ("statutory requirements, whether imposed specifically or by necessary implication, become part of the assumed contractual liability"); *see also Santos v. Insurance Placement Facility,* 426 Pa.Super. 226, 626 A.2d 1177, 1179 (1993) ("pertinent statutory provisions of Pennsylvania insurance law are deemed incorporated into insurance policies"); *cf. Boyce v. St. Paul Fire & Marine Ins. Co.,* No. 92–6525, 1993 WL 229961 at *1–2, 1993 U.S.Dist. Lexis 8602 at *3 (E.D.Pa.) ("Statutory law in effect at the time of issuance of an insurance policy becomes a part to the insurance contract as though it were expressly written therein."). Thus, even if the policy did not contain the required incontestability clause, we would follow the Pennsylvania Superior Court's lead and interpret the policy as if it contained that clause. Inasmuch as Hamo died within two years of the issuance of the policy, we conclude that American States is not precluded from defending the claim on the ground of Hamo's alleged fraudulent misrepresentation.

## C. *Material Misrepresentations*

■ Summary judgment is only appropriate where there is no genuine issue of material fact for the jury to decide. Fed. R.Civ.P. 56(c). For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Summary judgment is inappropriate when a case will turn on credibility determinations, *see Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513, and, as we have previously noted, on state of mind, *see Riehl v. Travelers Ins. Co.,* 772 F.2d 19, 24 (3d Cir.1985) ("issues of knowledge and intent are particularly inappropriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of the parties.").

■ For American States to prove the insurance policy void under Pennsylvania law, it must show that (1) Hamo's representations were false; (2) that Hamo knew they were false or made them in bad faith; and (3) that the representations were material to the risk being insured. *See Shafer v. John Hancock Mut. Life Ins. Co.,* 410 Pa. 394, 189 A.2d 234, 236 (1963). Fraud is presumed in these cases from knowledge of the falsity. *See id.*

■ In concluding that Hamo had made material misrepresentations as a matter of law, the magistrate judge referred to Dr. Honorio Pineda's 1985 hospital admission notes and post-surgical notes taken in connection with Hamo's gall bladder surgery, Dr. Pineda's 1991 statement and 1992 deposition with respect to his 1985 hospital notes and discussions with Hamo, and the 1985 examination notes of Dr. Richard A. Tiberio, who was consulted on the gall bladder surgery. Dr. Pineda had apparently treated Hamo with some regularity. App. at 570. Because the evidence relied on by the magistrate judge is crucial to our disposition, we discuss it in detail.

With respect to Hamo's denial of being told that he had any liver disease or disorder, the magistrate judge noted that in hospital notes dated November 9th, Dr. Pineda stated, "[d]iscussed problems re: liver cirrhosis with patient [Hamo] including entire ramifications and alcohol abstinence." App. at 184. Additionally, the hospital notes written by Dr. Pineda following the gall bladder surgery on November 6, 1985 state "liver cirrhosis" under "postoperative diagnosis" and "liver cirrhosis prominent" under "findings." App. at 181. There was also a progress note dated November 6th that stated, "[l]iver—cirrhotic, grossly." App. at 183. Finally, Dr. Pineda's office notes in connection with an examination on November 18, 1985 state he

had "[d]iscussed re: liver problem." App. at 156.

It is possible that a jury could find from the above that Hamo was told he had a liver disorder or disease. The evidence however is not conclusive. Knowledge of a "liver problem" is not necessarily knowledge of a liver "disorder" or "disease." In evidence given in connection with this lawsuit, Dr. Pineda gave a deposition and signed an affidavit. In his deposition, he testified that Hamo did not have liver cirrhosis in 1985. App. at 332. He stated that during the operation he noticed "fatty changes" in Hamo's liver and that for lack of a better term he noted them as "cirrhosis." App. at 333. He further testified that he never diagnosed Hamo with any liver disease and, significantly for our purposes, that he never said anything to Hamo from which Hamo would believe he had a liver disorder. App. at 582–83. Dr. Pineda explained that the notes on his discussions with Hamo refer to his telling Hamo that "if he does not cut down on his drinking, that he *will* develop cirrhosis." App. at 335 (emphasis added). The doctor stated that he did tell Hamo that he had noticed "fatty changes" in the liver. App. at 335.

American States maintains that "fatty liver" is a disorder that should have been disclosed on the application. We need not decide at this time whether "fatty liver" is in fact a liver disorder. In light of Dr. Pineda's sworn testimony that he never diagnosed Hamo with any liver disorder and that he never led Hamo to believe he had a liver disorder, App. at 582–83, we are unprepared to say that, as a matter of law, when Hamo heard Dr. Pineda tell him that there were "fatty changes", Hamo realized he had a liver disease or disorder known as "fatty liver."

American States relies on the testimony of Dr. Tiberio who stated that Hamo had signs of liver disease in 1985. App. at 948. However, Dr. Tiberio also stated in his 1992 affidavit, "I absolutely would not have told ... Hamo he had cirrhosis of the liver, nor did I tell him he had any disease or disorder of the liver." App. at 684.

Finally, American States directs our attention to some blood tests done on Hamo by Dr. Donald Blatchley, a dermatologist, which showed abnormal levels of liver enzymes. App. at 741–42. But Dr. Blatchley testified that he never discussed the results of those blood tests with Hamo, who therefore may not have known that the blood tests showed high liver enzyme levels. App. at 745.

In light of the record developed to date, we conclude that there is a genuine issue of material fact as to Hamo's knowledge of any liver disease or disorder at the time he filled out the application in 1989. American States argues that Pineda's testimony is "incredible" in light of the medical records. That is a credibility question for a jury to decide. It cannot be decided on summary judgment.

With respect to Hamo's negative response to the question on "excessive" alcohol consumption, the magistrate judge relied on Dr. Pineda's testimony that he told Hamo to "cut down on his drinking," Hamo's hospital admission form signed by Dr. Pineda stating "[h]e drinks alcohol excessively most times," App. at 179, and Dr. Tiberio's notes stating that Hamo "relates drinking 4–5 alcoholic beverages a day." App. at 180. Dr. Tiberio's consultation report lists a "history of alcohol abuse" and speaks of Hamo being "tremulous" and "susceptible to major withdrawal with DTs and seizures." App. at 180. Finally, Tiberio's report notes that "observers" stated that Hamo drank up to a fifth of whiskey a day. App. at 180.

Hamo's drinking habits are also referred to in a 1988 medical form Hamo filled out for heart specialist Dr. Carey McMonagle stating that he drank a quart of whiskey a week and had done so for the past 25 years. App. at 312. Dr. Blatchley, the dermatologist whom Hamo saw in late 1987/early 1988 for a rash, noticed high alcohol levels in tests he conducted. App. at 742. Dr. Dominic DiLeo, who treated Hamo starting in 1991, testified that he felt Hamo had been an alcoholic for several years. App. at 850. He based this opinion on Dr. Pineda's medical records of Hamo and on the condition of Hamo's liver which by 1991 definitely was cirrhotic. App. at 850–51.

This is strong evidence from which a reasonable jury might find that Hamo made a

knowing misrepresentation when he answered "no" to the question of whether he drank to "excess." However, even though it is uncontested that Dr. Pineda told Hamo to cut back on his drinking, he stated that he never diagnosed Hamo as having a drinking problem or told him that he had a drinking problem. App. at 585–86. He also stated that at the time of the gall bladder operation, he had no indication that Hamo "was drinking excessively," App. at 585, that Hamo definitely did not have the DTs, App. at 572, and that he attempted to tell all of his patients who drank alcohol at all that they should not. App. at 584–85. Dr. Tiberio, who was the source of the "DTs" comment, explained that Hamo was not suffering from the DTs and that the comment reflected his efforts to prevent that situation.[10] App. at 668–69.

The problem with determining whether Hamo's response to the "excess" alcohol consumption question was a misrepresentation as a matter of law is the subjective nature of "excess" in this context. A private investigator for American States reported that Hamo was "a social drinker only" who did "not drink to excess at any time." App. at 530. Dr. Tiberio stated in his deposition that although he believed Hamo drank to excess, "I don't think that's a universal opinion." App. at 674.

The chief of American States' claims department testified that he did not know what "excessive" drinking was or how anyone could answer that question. App. at 500. Whether alcohol consumption is "excessive" may depend on an individual's weight and tolerance level. We note that it was American States' own terminology that inserted this ambiguity into the application. In the absence of any evidence that Hamo believed that he was an alcoholic or that he thought he drank to excess, a finding that Hamo's response was a fraudulent misrepresentation is inappropriate for summary judgment.

The magistrate judge did not discuss American States' argument that Hamo made a material misrepresentation when he neglected to mention on his application, in response to a question about all diagnostic and blood studies, the blood tests done by Dr. Blatchley which showed unusual liver enzyme results and could have signaled a liver disorder. There is insufficient evidence on the record for this Court to hold as a matter of law that this was a deliberate and material omission,[11] particularly because those tests were taken by a dermatologist consulted by Hamo in connection with a rash. The rash may have disappeared because Hamo failed to keep his third appointment with the dermatologist to discuss the lab results, and there is no evidence Hamo knew of the results. App. 743–748.[12]

We conclude therefore that there are genuine issues of material fact as to all of the alleged fraudulent misrepresentations which preclude the grant of summary judgment.

■ Finally, we reject American States' argument that Coolspring has waived this issue because it also filed a motion for summary judgment. Coolspring only argued that there was no genuine issue of material fact for purposes of its own motion for summary judgment, and adequately preserved its objection to granting summary judgment for American States. *See Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute . . . that the losing party waives judicial . . . determination whether genuine issues of material fact exist.").

---

10. We do not resolve Coolspring's argument that parts of Tiberio's notes are inadmissible hearsay, because that is not necessary for our disposition.

11. Innocent mistakes, even of material facts, are not enough to void a policy on the grounds of misrepresentations of material fact by the accused. *American Franklin Life Ins. Co. v. Galati,* 776 F.Supp. 1054, 1060 (E.D.Pa.1991).

12. From the deposition of Dr. Blatchley:

> Q Did you ever discuss any of the blood work with Mr. Hamo?
> A No, he never came back.
> Q The first time?
> A I didn't have it then yet. I didn't discuss it with him then, to my knowledge. As a matter of fact, I have no knowledge of discussing it with him.
> App. 745.

### III.

Because there are genuine issues of material fact, we will vacate the district court's order granting summary judgment for the defendant, and remand for proceedings consistent with this opinion.