NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  19-2682
_____

ANTHONY J. SAMANGO, JR.,
                                          Appellant

v.

UNITED STATES OF AMERICA


_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-17-cv-02484)
District Judge: Honorable Petrese B. Tucker
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1
on April 15, 2020

Before: CHAGARES, SCIRICA, and ROTH, *Circuit Judges*

(Filed:  October 29, 2020)

_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

SCIRICA, *Circuit Judge*

Anthony J. Samango, Jr., was assessed unpaid federal taxes by the Internal Revenue Service for the 2008 tax year. The IRS determined that SS Frames Corporation—where Samango was president and a shareholder—failed to pay its taxes and that Samango was responsible. He challenged that assessment by suing the United States in federal court, arguing that he was not responsible for the taxes and did not willfully fail to pay them. The trial judge granted summary judgment to the government. Because the IRS's tax assessment is supported by a strong record, and Samango has not met his burden to rebut that record, we will affirm.

**I.**

This case stems from a 2008 tax assessment levied against Samango by the IRS under 26 U.S.C. § 6672. The IRS determined that Samango was responsible for SS Frames' failure to pay federal withholding taxes for its employees. SS Frames is a labor contractor for which Samango was a shareholder and president during the relevant time period.

In 2008, Samango's primary construction company, Carson Concrete Corporation, began subcontracting its labor from SS Frames. Samango had been the president of Carson Concrete since 1977 and had been its sole shareholder since 2000. As president of Carson Concrete, Samango had "oversight of everything," signed all of Carson Concrete's state and federal tax returns, and he and his son were the sole signatories on Carson Concrete's checking accounts. Carson Concrete began using SS Frames for labor

2

to lower its workers' compensation premiums, which had increased due to workplace accidents involving Carson Concrete employees. As a new company without "bad experience," SS Frames' premiums were half the cost.

Carson Concrete and SS Frames did not behave like separate companies. Although SS Frames supplied Carson Concrete with labor for at least one major construction project, no formal contract or other writing memorialized that agreement. Both companies shared the same telephone number and business address, which SS Frames occupied rent-free. Both companies shared employees, including Carson Concrete's full-time controller, who helped prepare Carson Concrete's tax returns, and was listed as SS Frames' contact for state audits. The companies also shared a superintendent, who was cited in a 2008 state report as "indicat[ing] that he does not know why there are two separate organizations and stat[ing] that he draws no distinction" between Carson Concrete and SS Frames employees. And importantly, both companies shared Samango as a shareholder and—throughout 2008—as president.

Documents make clear that Samango was president of SS Frames and played a major role in operating the company. In December 2007, Samango signed a corporate resolution form stating that he was the president, secretary, and treasurer of SS Frames and was authorized to open bank accounts for the company. And, in a 2008 form filed with the Pennsylvania Department of Labor and Industry, Samango signed and stated, under penalty of perjury, that he was the president, 100 percent owner, and the sole officer of SS Frames who "overs[aw] [the] entire operations on a daily basis."

Samango was involved in SS Frames' finances—both directly and through Carson Concrete. He signed and filed SS Frames' federal tax return for all quarters of 2008, and the state tax return for the first quarter of 2009. Carson Concrete, using the bank account controlled by Samango, paid SS Frames' employees' gross wages, its state unemployment taxes, its workers' compensation premiums, and its union dues. Samango did not, however, take any steps to ensure federal taxes were withheld and paid by SS Frames.

Samango claims that there were other owners of SS Frames who were responsible for paying federal taxes. He purportedly forgets the full names of the alleged owners, but he does remember that they were "two minority individuals" and one was named "Jose." Nothing else in the record suggests the existence of the "two minority individuals" nor lists them as owners or officers of SS Frames. Samango also claims that while he "may have been an officer [of SS Frames] for a week," it was only for the limited purpose of applying for insurance and dealing with an issue that impacted Carson Concrete. But Samango does not deny he signed multiple documents as president of SS Frames— including tax returns—spanning from 2007 through 2009.

In 2014, the IRS assessed SS Frames' unpaid taxes for 2008 against Samango—an amount totaling $878,298.[1] Prior to the assessment, an IRS revenue officer traveled to the office shared by Carson Concrete and SS Frames to discuss the unpaid taxes. Samango

[1] The IRS also assessed $254,924 for the 2009 tax year. During a claim for a refund, Samango told an IRS officer that he had no knowledge of SS Frames. The IRS officer abated the 2009 assessment, and though the officer tried to reverse that action when he discovered it was an error, it was too late. Only the 2008 assessment remains at issue.

4

refused to speak with the officer other than to say he had heard of SS Frames but was not sure if he was an officer. The IRS officer followed up by sending an interview summons to Samango and the controller of Carson Concrete, who also worked for SS Frames. Neither came in for an interview.

Without a response to the summons, the IRS provided Samango with a proposed assessment for SS Frames' unpaid 2008 taxes. Again, Samango did not respond. The IRS then formally imposed the assessment. At that point, Samango filed a claim with the IRS contesting the assessment. The claim was denied.

Eventually, Samango sued the United States in the Eastern District of Pennsylvania, seeking a refund of the 2008 assessment and damages. The government counter-claimed with a request to reduce the 2008 tax assessment to a judgment with interest. Both parties filed motions for summary judgment. The trial court denied Samango's motion and granted the government's motion—entering judgment against Samango for the taxes owed plus interest and penalties. Samango now appeals.

**II.[2]**

---

[2] The trial court had jurisdiction under 28 U.S.C. § 1346(a)(1) and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment. *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 146 (3d Cir. 1993). We apply the same standard as the trial court did. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 602–03 (3d Cir. 2002). Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute of material fact and the evidence establishes its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In determining the existence of a disputed issue of material fact on a motion for summary judgment, all inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

On appeal, Samango contends the trial court wrongly determined that he did not meet his burden of rebutting the IRS's assessment. He argues his deposition testimony sufficiently rebuts the evidence supporting the IRS's assessment. His deposition testimony, however, is conclusory and unsubstantiated. We will affirm the trial court.

Employers are required by law to withhold federal social security and income taxes from the wages of their employees and pay those taxes to the government. 26 U.S.C. §§ 3102(a), 3402(a). Under 26 U.S.C. § 6672(a), "[a]ny person" required to pay federal taxes who "willfully" fails to collect and pay or who "willfully" evades those taxes is liable for the unpaid amount. The two conditions of § 6672 liability are (1) that "the individual must be a 'responsible person,'" and (2) that the "failure to pay the tax must be 'willful.'" *Greenberg v. United States*, 46 F.3d 239, 242 (3d Cir. 1994) (quoting *United States v. Carrigan*, 31 F.3d 130, 133 (3d Cir. 1994)).

When the IRS assesses liability under § 6672, that assessment is granted a "rebuttable presumption" of being correct. *Brounstein v. United States*, 979 F.2d 953, 954 (3d Cir. 1992) (citing *Psaty v. United States*, 442 F.2d 1154, 1160 (3rd Cir. 1971)); *see also United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002) ("It is well established in the tax law that an assessment is entitled to a legal presumption of correctness . . . ."). A taxpayer must rebut the presumption by a "preponderance of the evidence." *Psaty*, 442 F.2d at 1160 (citation omitted). Therefore, if a taxpayer challenges a § 6672 assessment in federal court, he bears the burden of providing sufficient evidence to show that the assessment was incorrect because either he was not a responsible person or he did not willfully fail to pay the tax. *See Brounstein*, 979 F.2d at 954.

6

Here, Samango acknowledges that he has the burden to show the IRS's assessment was incorrect, but he provides only his own conclusory and unsubstantiated deposition testimony in an effort to rebut clearly documented evidence. Typically, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (quoting *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)). That is especially true in this case because Samango bears the burden—by a preponderance of the evidence—of rebutting the IRS's assessment that he was a responsible person and willfully failed to pay taxes. *See Brounstein*, 979 F.2d at 954. As explained further, the record supporting the assessment is strong, and the evidence Samango provides is inadequate to meet his burden of rebuttal.

**A.**

A "responsible person" is someone who is "required to collect, truthfully account for or pay over any tax due to the United States." *Greenberg*, 46 F.3d at 242–43 (quoting *Carrigan*, 31 F.3d at 133). "Responsibility is a matter of status, duty or authority, not knowledge." *Quattrone Accountants, Inc. v. I.R.S.*, 895 F.2d 921, 927 (3d Cir. 1990). And "[w]hile a responsible person must have significant control over the corporation's finances, exclusive control is not necessary." *Brounstein*, 979 F.2d at 954. "A person has significant control if he has the final or significant word over which bills or creditors get paid." *Quattrone,* 895 F.2d at 927. Additionally, more than one person can be "responsible" for a particular employer. *Id.* at 926.

To determine whether an individual is a responsible person, we consider a nonexclusive list of factors, which include:

> (1) contents of the corporate bylaws, (2) ability to sign checks on the company's bank account, (3) signature on the employer's federal quarterly and other tax returns, (4) payment of other creditors in lieu of the United States, (5) identity of officers, directors, and principal stockholders in the firm, (6) identity of individuals in charge of hiring and discharging employees, and (7) identity of individuals in charge of the firm's financial affairs.

*Greenberg*, 46 F.3d at 243 (quoting *Brounstein*, 979 F.2d at 954–55).

We perceive no error in the trial court's analysis based on these factors or in its conclusion that Samango failed to rebut the presumption that he was a responsible person. In 2008, Samango was the president and a shareholder of SS Frames. He signed, under penalty of law, a form stating that he had oversight over SS Frames' "entire operations on a daily basis."[3] Samango signed state and federal tax returns on behalf of SS Frames. He was also president of Carson Concrete with "oversight of everything." Money paid by Carson Concrete on behalf of SS Frames was controlled by Samango, and Carson Concrete paid SS Frames' gross wages, workers' compensation premiums, unemployment taxes, and union dues. In fact, Carson Concrete and SS Frames were practically indistinguishable, sharing office space and employees—including Carson Concrete's twenty-year controller who served in a similar role for SS Frames. When

---

[3] In his brief, Samango incorrectly asserts that the record does not support that he had oversight of SS Frames' "entire operations." In January 2008, Samango signed an Application for Workers' Compensation Coverage on behalf of SS Frames and *as its president*. Item ten of the form asks for a "complete, detailed job description" of the "corporate officers and/or owners." The only job description states that the "[p]resident"—meaning Samango—"oversees entire operations on a daily basis."

combining his actions and responsibilities as president of both SS Frames and Carson Concrete, it is clear that Samango had significant control over SS Frames' financial affairs, making him a responsible person. *Compare Greenberg*, 46 F.3d at 243–44 (affirming a taxpayer had significant control of finances when taxpayer completed tax forms, was an officer and minority shareholder, and signed checks), *with Carrigan*, 31 F.3d at 134 (reversing trial court's determination that a taxpayer was a responsible person because he never signed tax returns and had no access to corporate check books).

Samango fails to rebut the record that establishes him as a responsible person. He contends he did not have significant control of SS Frames even though he was president. In his deposition, he claimed that he was only president of SS Frames for the limited purpose of working through insurance issues for the company. His theory offers no explanation, however, for why he also signed tax documents for SS Frames or why the relationship between Carson Concrete and SS Frames was such that the superintendent, who worked for both companies, "dr[ew] no distinction" between them.

Samango also contends that he did not have control over SS Frames by alluding in his deposition to "two minority individuals," who allegedly owned SS Frames and were the ones responsible for the failure to pay taxes. But Samango has not provided these individuals' full names, let alone any documentation listing them as owners and operators of SS Frames. Even assuming these individuals were owners of SS Frames and were also responsible persons, Samango still does not rebut the record. Companies can have more than one responsible person, *Quattrone,* 895 F.2d at 926, and the existence of these two

9

individuals does not rebut any of the documented evidence of responsibility, including that Samango was president of SS Frames and signed its tax returns.

**B.**

Samango also contends that the trial court erred in finding that he "willfully" failed to pay taxes. *See* 26 U.S.C. § 6672(a). Willfulness under § 6672 is either a "voluntary, conscious and intentional decision" to pay other creditors rather than pay taxes, *Quattrone*, 895 F.2d at 928, or a "reckless disregard" that the taxes will go unpaid, *Brounstein*, 979 F.2d at 956. "Reckless disregard includes failure to investigate or correct mismanagement after being notified that withholding taxes have not been paid." *Greenberg*, 46 F.3d at 244 (quoting *Morgan v. United States*, 937 F.2d 281, 286 (5th Cir. 1991) (per curiam)). Any payments to other creditors or bills, including wages, made with knowledge that federal taxes are due establishes willfulness. *See Greenberg*, 46 F.3d at 244.

Samango admits that he took no steps to ensure SS Frames withheld federal taxes. Samango had been running Carson Concrete for over thirty years. He knew, or should have known, that federal withholding taxes generally needed to be paid. As president and a shareholder of SS Frames, Samango had oversight over the "entire operation." He signed tax forms for SS Frames, thereby acknowledging that he was involved in assessing the company's tax burdens and obligations. He also knew that Carson Concrete was paying SS Frames' various bills—including gross wages—but was not paying SS Frames' federal taxes. As president of SS Frames, Samango knew, or recklessly disregarded, the company's financial obligations, yet he took no steps to ensure payment

10

of federal taxes. Taken in full, the record shows that Samango knew, or recklessly disregarded, that SS Frames owed withholding taxes and was not paying those taxes. *See Brounstein*, 979 F.2d at 956 (finding willfulness when taxpayer knew that taxes were due by signing tax returns but continued to pay creditors other than the government).

Samango contends that his conduct was not willful because he did not use SS Frames' checks to pay its obligations[4] and because SS Frames and Carson Concrete are unrelated. But Samango again fails to provide any evidence, other than his deposition, to rebut the clear record establishing him as SS Frames' president with significant control who knew—or recklessly disregarded—that federal taxes went unpaid. He also fails to rebut the record showing that Carson Concrete and SS Frames were practically indistinguishable, sharing an address and important employees—including Samango himself. Thus, Samango has not rebutted the record showing that he willfully violated his duties as a responsible person.

## III.

For the foregoing reasons, we will affirm the trial court's entry of summary judgment in favor of the government.

---

[4] In his deposition, Samango stated that he "didn't sign any SS Frames checks" but added a caveat that "if you have checks from SS Frames with my signature, . . . I did sign them."