**David B. HERMAN, Plaintiff,**

v.

**CITY OF ALLENTOWN, Defendant.**

**No. CIV. A. 96–6942.**

United States District Court,
E.D. Pennsylvania.

Nov. 21, 1997.

Signey L. Gold, Philadelphia, PA, for plaintiff.

John W. Ashley, Allentown, PA, for defendant.

### DECISION AND ORDER

VAN ANTWERPEN, District Judge.

## I. BACKGROUND

Plaintiff, a former firefighter for the City of Allentown ("City"), has sued the City for discrimination under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiff was dismissed from the Fire Department after he was arrested for altering a prescription for the pain killing drug called Percocet. Plaintiff filed a grievance with his local union and the City agreed to rehire him subject to certain conditions. Defendant later changed those conditions in order to prevent the Plaintiff from being rehired.

This court has subject matter jurisdiction since this case arises out of the laws of the United States. Venue lies in this district. All conditions precedent to the institution of this suit have been fulfilled. On July 18, 1996, a Notice of a Right to Sue was issued by the United States Department of Justice and this action has been timely filed within 90 days of the receipt of that notice. Plaintiff has exhausted all administrative remedies prior to filing this lawsuit. This suit is ripe for our consideration.

For reasons that will be discussed in the remainder of this Decision, we find that the Defendant intentionally discriminated against the Plaintiff in violation of the ADA when the City refused to rehire him. We will order the City to rehire the Plaintiff and award the Plaintiff back pay (with interest) and attorneys fees.

## II. FINDINGS OF FACT

1. Plaintiff David B. Herman was hired by the City of Allentown as a firefighter on July 8, 1987. Tr. 9/22/97 at 20.

2. Plaintiff received satisfactory work performance evaluations while he was employed by the City. (Plaintiff's Exs. 1, 2 and 3).

3. During the course of his employment, Plaintiff sustained a back injury while fighting a fire. Plaintiff herniated a disk when he fell down some steps. Tr. 9/22/97 at 7, 24–25.

4. Plaintiff sought treatment for his back injury with his family doctor. The doctor prescribed a medication known as Percocet for the pain associated with the back injury. Tr. 9/22/97 at 7.

5. Plaintiff violated the Fire Department's rules and regulations by never informing his supervisors that he was taking this prescription medicine. Tr. 9/22/97 at 49–50, 52.

6. Plaintiff became dependent and addicted to Percocet. Tr. 9/22/97 at 25–26.

7. In May of 1994, Plaintiff altered two prescriptions for Percocet which had been prescribed for him by his family doctor. Plaintiff changed the amount of pills prescribed from 6 to 16. Plaintiff admitted that he altered two prescriptions. Tr. 9/22/97 at 27, 51, 59.

8. Plaintiff was arrested on May 3, 1994, for altering his Percocet prescriptions in violation of Pennsylvania criminal law. Tr. 9/22/97 at 27–29.

9. The criminal charges were disposed of without a trial. Plaintiff was placed on Accelerated Rehabilitative Disposition ("A.R.D.") and his criminal record was expunged in June of 1995. Tr. 9/22/97 at 9, 28.

10. As a result of the said criminal charges, Plaintiff was suspended from active duty as a firefighter in May of 1994, and was thereafter terminated on October 17, 1994.

11. Shortly after his arrest in May of 1994, Plaintiff sought professional help for his drug dependency problem. He consulted with Mr. Richard O'Donnell, the Director of the Lehigh County Drug and Alcohol Intake Unit. Tr. 9/22/97 at 10–11, 29, 99.

12. Plaintiff also met with Dr. Valella for counseling purposes. Tr. 9/22/97 at 10–11, 28–29.

13. Mr. O'Donnell, after evaluating Plaintiff on May 12, 1994, found that he "does not evince any present form of dependency on alcohol or any other drug." (Plaintiff's Ex. 11).

14. Plaintiff testified that he stopped taking Percocet since the day he was arrested in May of 1994. No evidence was presented that this was not the case. Tr. 9/22/97 at 10, 11, 28–29, 99.

15. Plaintiff challenged the termination of his employment by filing a grievance through his union. An arbitration hearing was scheduled for February 1, 1995. Tr. 9/22/97 at 12, 30–31.

16. On February 1, 1995, the City, the Union, and the Plaintiff signed a settlement titled *Settlement Memorandum By and Between the City of Allentown and Local No 302 IAFF*. (Plaintiff's Ex. 4).

17. The settlement stated:

(a) That the City would restore the Plaintiff as a firefighter on February 11, 1995;

(b) That Plaintiff would be subject to random drug tests for three years;

(c) That Plaintiff would authorize the release of all information regarding his taking of prescription drugs to the City;

(d) That Plaintiff would sign a release authorizing the EAP (Employee Assistance Program) to release any information concerning his treatment under that program;

(e) That Plaintiff must be cleared for return to work by a doctor selected by the city;

(f) That Plaintiff would take a drug test on February 1, 1998;

(g) That Plaintiff could complete any EAP aftercare while on duty during non-work hours;

(h) That the Union would pay the arbitrators fee for February 1, 1995;

(i) That the Plaintiff would be discharged immediately for any future drug related offenses and that the Union would file no grievance, arbitration demand, or unfair labor practice charge;

(j) That the City would be entitled to consider Plaintiff's drug offense as part of the Plaintiff's disciplinary record;

(k) That the Plaintiff would be entitled to back pay for the period between May 4, 1994 and February 11, 1995.

(*l*) That Plaintiff's seniority would be cut off between October 17, 1994 through February 11, 1995.

(m) That the Plaintiff would have to make employee contributions to the pension fund if he wanted to have pension credits between and May 4, 1994 and October 17, 1994;

(n) That the Union would withdraw with prejudice from the arbitration resulting from the grievance filed by the Plaintiff on May 9, 1994;

(*o*) That the settlement would be made without prejudice to any future cases involving the fire department; and

(p) That the settlement would remain confidential.

18. This settlement was signed by the Union, the City, and the Plaintiff on February 1, 1995. (Plaintiff's Ex. 4).

19. Pursuant to the agreement, Plaintiff took a drug test on February 1, 1995. Prior to the administration of the test, Plaintiff disclosed to the test takers that he had been taking cough medicine with codeine which had been lawfully prescribed by his physician for the treatment of bronchitis. Tr. 9/22/97 at 33–35. Plaintiff did not inform the prescribing physician about his prior problems with Percocet. Tr. 9/22/97 at 59–60.

20. The drug test results were positive for the cough medicine prescribed by Plaintiff's family physician. Tr. 9/22/97 at 35.

21. The positive drug test results were transmitted to Jenny Lilly, the Assistant Manager of Human Resources for the City. Ms. Lilly was involved in the decisions regarding Plaintiff and his return to work. Tr. 9/22/97 at 35, 65.

22. After receiving the positive test results, Ms. Lilly asked the plaintiff if he was still addicted to drugs. Plaintiff responded that he was not addicted and offered to take a second drug test. Tr. 9/22/97 at 38–39.

23. No second drug test was ever administered. Tr. 9/22/97 at 39.

24. Upon learning that there was "a problem with the drug testing," Fire Chief Novosat had a change of heart with regard to Plaintiff's reinstatement. He and Ms. Lilly were disgusted that Plaintiff tested positive for cough medicine. They perceived that Plaintiff was "dirty again" and that he was "doing the same thing for which he had been originally terminated." Tr. 9/22/97 at 62–64.

25. After the positive drug test, Ms. Lilly had Plaintiff re-evaluated by Mr. O'Donnell, the Director of the Lehigh County Drug and Alcohol Unit. Tr. 9/22/97 at 64. Mr. O'Donnell had a contract with the City and was called upon to evaluate City employees in connection with its EAP program. As a result of the evaluation, Mr. O'Donnell cleared Plaintiff to go back to work sometime after February 1, 1995. Tr. 9/22/97 at 65–67, 97.

26. Not satisfied with Mr. O'Donnell's evaluation, Ms. Lilly then referred Plaintiff to be examined by Dr. Ralph Stolz, a specialist in the field of Addiction Medicine. Tr. 9/22/97 at 81. This was the first time the City ever referred an employee to Dr. Stolz. Tr. 9/22/97 at 100.

27. Ms. Lilly told Dr. Stolz that the reason behind the Plaintiff's referral was that he had not informed his superiors about the cough medicine he was taking. Tr. 9/22/97 at 100.

28. On February 14, 1995, Dr. Stolz conducted an examination of Plaintiff and stated that he was "not addicted at that time." Tr. 9/22/97 at 82.

29. On November 24, 1995, Dr. Stolz issued a report recommending that Plaintiff return to work as a firefighter without restrictions except as follows: (1) that Plaintiff abstain from all mood altering drugs; (2) that Plaintiff discuss any prescriptions with Dr. Stolz; (3) that Plaintiff attend counseling; (4) that Plaintiff attend Narcotics Anonymous meetings three times weekly for the next six months; (5) that Plaintiff submit to a witnessed urine drug screen on demand on a weekly basis for three years. Dr. Stolz also recommended that Plaintiff "consider entering the recovery center, which was an intense outpatient treatment program, in order to meet the … third recommendation." Tr. 9/22/97 at 84; (Defendant's Ex. 2).

30. Dr. Stolz faxed his report to Ms. Lilly. Tr. 9/22/97 at 89. After she received this

report, Ms. Lilly called Dr. Stolz and told him that Plaintiff had taken and failed a second drug test which tested positive for cough medicine. Tr. 9/22/97 at 89–93. Plaintiff, in fact, was never even given the opportunity to take a second drug test. Tr. 9/22/97 at 111–12.

31. Ms. Lilly also told Dr. Stolz that Plaintiff's family doctor did not know about Plaintiff's prior history with Percocet. Tr. 9/22/97 at 102.

32. Based on the false information, imparted by Ms. Lilly, that Plaintiff failed a second drug test, as well as the fact that Plaintiff never told his family doctor about his prior drug history, Dr. Stolz changed his recommendation to require the Plaintiff to enter and successfully complete an 18 week intense drug treatment program with the Allentown Osteopathic Medical Center ("AOMC") prior to returning to work. Tr. 9/22/97 at 92–93, 98. We find that the change in recommendation was based in large part on the doctor's erroneous belief, created by Ms. Lilly's untruthful information, that Plaintiff failed a second drug test.

33. Ms. Lilly then amended the February 1, 1995 settlement agreement to incorporate the requirement that Plaintiff enter and complete the more intense drug treatment program recommended by Dr. Stolz before returning to work. Tr. 9/22/97 at 35; (Plaintiff's Ex. 6).

34. Plaintiff was willing to submit to the drug treatment program recommended by Dr. Stolz, but for the fact that he could not afford the cost of the program which was approximately $7000. Tr. 9/22/97 at 13, 35–38.

35. Plaintiff told Ms. Lilly that he could not afford the AOMC Program. Ms. Lilly insisted that he complete the program before he return to work. Tr. 9/22/97 at 35–37, 58.

36. Plaintiff requested that he be permitted to enter into an alternative drug treatment program with Richard O'Donnell, which would have been the functional equivalent to the program recommended by Dr. Stolz. Tr. 9/22/97 at 37–38, 93.

37. Ms. Lilly refused Plaintiff's request to enter the alternative drug treatment program and insisted that Plaintiff's reinstatement be conditioned on the completion of the program recommended by Dr. Stolz. Tr. 9/22/97 at 36–39.

38. Ms. Lilly did find a drug treatment program through Berks County that would have been covered by Plaintiff's insurance. Yet, she never informed the Plaintiff about this program. Tr. 9/22/97 at 108.

39. Because Plaintiff could not afford to enter into the AOMC's drug treatment program, and because the City refused to allow him to participate in an equivalent program that he could afford, the City refused to reinstate Plaintiff to his former position as a firefighter.

40. We find that the Defendant had no legitimate reason for believing that Plaintiff was a drug addict, especially in light of two expert's opinions to the contrary. We find that Ms. Lilly and Chief Novosat were disgusted with the Plaintiff because he took cough medicine for his bronchitis. We find that they intentionally discriminated against the Plaintiff by altering the original settlement agreement to impose an unreasonable requirement—namely that Plaintiff attend the AOMC Program—which the Plaintiff could not afford and by refusing to allow the Plaintiff to attend a substantially similar program that was covered by his insurance. Defendant's intentional discrimination arose from Ms. Lilly and Chief Novosat's disgust with what they erroneously perceived as the Plaintiff's disability. We find that Defendant used the fact that the Plaintiff was taking cough syrup as a pretext to justify their intentional discrimination.

41. In 1994, the last year Plaintiff worked for the City, he earned $33,000 per year.

42. In June of 1995, at the time his criminal record was expunged, Plaintiff began to seek other employment. Tr. 9/22/97 at 44. Plaintiff secured part-time employment as a security guard with Wells Fargo. Tr. 9/22/97 at 47. In 1995, he earned $2,940 working as a security guard. He also earned $14,300 from an engraving business that he maintained while he was a firefighter. In 1996 he earned $3,360 as a security guard and $8,500 from the engraving business. In 1997, at the

date of this trial, he had earned $1,920 as a security guard and $6,200 from the engraving business.

43. We find that Plaintiff suffered little, if any, emotional turmoil as a result of the City's failing to rehire him. Any turmoil and embarrassment was caused instead by the Plaintiff's own actions which led to his arrest.

## III. DISCUSSION

### A. Plaintiff Has Proven His Disability Discrimination Case

■ Plaintiffs asserting ADA claims bear the initial burden of establishing a prima facie case of unlawful discrimination. *Olson v. General Electric Astrospace,* 101 F.3d 947, 951 (3d Cir.1996). "A plaintiff presents a prima facie case of discrimination under the ADA by demonstrating: (1) he is a member of a protected class in that he has a 'disability'; (2) he is qualified for the position in that he can perform the work with reasonable accommodations; and (3) he has suffered an adverse employment decision as a result of discrimination." *Horth v. General Dynamics Land Systems, Inc.,* 960 F.Supp. 873, 877 (M.D.Pa.1997)(*citing Olson,* 101 F.3d at 951). After the plaintiff has met this initial burden, the employer must then produce some legitimate non-discriminatory reasons for the employment decision. *Olson,* 101 F.3d at 951. Once the employer has met this burden of production, the plaintiff must show that the defendant's asserted nondiscriminatory reasons are pretextual. *Olson,* 101 F.3d at 952; *Horth,* 960 F.Supp. at 877.

Defendant wishes to focus our attention on the City's legitimate reasons for dismissing the Plaintiff from the Fire Department. *See Defendant's Brief* at 10. We agree that the Defendant had every reason to discharge the Plaintiff. The Plaintiff failed to disclose to his supervisor that he had been taking prescription drugs, as required by Fire Department regulations. And, Plaintiff had been arrested for forging a prescription to illegally obtain more drugs. If this discrimination case were about the City's authority to discharge the Plaintiff we would not hesitate in finding for the defense. But, the action which is the subject of this ADA suit is not the City's initial firing of the Plaintiff. This case is really about the City's discrimination against the Mr. Herman in its failure to rehire the Plaintiff.

The City suspended Mr. Herman as a result of his arrest for altering prescriptions in May of 1994. Mr. Herman stopped taking Percocet the day he was arrested. The city terminated Mr. Herman on October 17, 1994. In February of 1995, the City and the Firefighter's union entered into an agreement to rehire the Plaintiff subject to six conditions. The two pertinent conditions for this trial were a requirement that the Plaintiff take a drug test on February 1, 1995 (the day the parties signed the agreement) and that the Plaintiff had to be cleared to return to work by a physician selected by the city.

Plaintiff took a drug test the day he signed the agreement. He informed the test administrator that he was currently taking prescription cough medicine that had been prescribed by his family doctor. The drug test result was positive for the cough medicine.

The City had the Plaintiff re-evaluated by Richard O'Donnell, the Director of the Lehigh County Drug and Alcohol Intake Unit. As a result of the evaluation, Mr. O'Donnell cleared the Plaintiff to return to work. The City also had the Plaintiff evaluated by Dr. Stolz on February 14, 1995. Dr. Stolz was aware that Mr. Herman tested positive for cough medicine. Dr. Stolz issued a report stating that Plaintiff's condition was good, that he had not taken any Percocet since the arrest, and that his only use of mood altering chemicals since his arrest occurred when he properly took the prescription cough medicine. (Defense Ex. 2). Furthermore, upon his examination of the Plaintiff, Dr. Stolz found that the Plaintiff was not addicted to Percocet. Tr. 9/22/97 at 84. Dr. Stolz set five conditions for Mr. Herman's return to work: (1) abstinence from mood altering chemicals, (2) disclosure of all prescriptions to Dr. Stolz, (3) attendance at counseling sessions to make him more aware of his possible addiction and to help him deal with family issues, (4) attendance at Narcotic Anonymous meetings three times a week for six months, and (5) weekly urine tests for the next three years.

After Plaintiff's drug test came back positive for the cough medicine, it appears that Ms. Lilly called Dr. Stolz and told him that Plaintiff's physician did not know about his prior drug history. Ms. Lilly also told Dr. Stolz that Plaintiff had failed a second drug test. However, Mr. Herman had never been given the chance to take a second drug test, though he had offered to do so. Based in large part on the false information communicated by Ms. Lilly, Dr. Stolz added an additional requirement for Mr. Herman's return to work: that Plaintiff participate in the AOMC's intense outpatient treatment program prior to returning to work. This program cosν approximately $7000 and was not covered by Plaintiff's insurance. Ms. Lilly amended the settlement agreement between the City and the Firefighter's Union to require Mr. Herman to complete this program before returning to work.

Plaintiff told Ms. Lilly that he could not afford to take the AOMC's $7000 program since it was not covered by his insurance. He asked if he could take a functionally equivalent program, offered by Mr. O'Donnell, that his insurance would cover. Dr. Stolz, himself, testified that the program which Mr. Herman desired to take was substantially the same as the one he was offering through the AOMC. Tr. 9/22/97 at 93. Mr. Herman spoke to Ms. Lilly a number of times trying to work out an agreement so that he could take an alternative program. *Id.* at 36–38. Ms. Lilly testified that she had told the Union that Mr. Herman could complete a rehabilitation program in Berks County that his insurance could cover. *Id.* at 108. However, a letter from the Union to the City makes no mention of this offer. (Plaintiff's Ex. 12). And, Ms. Lilly admits that she never told Mr. Herman that he could take the Berks County program. Tr. 9/22/97 at 110. When asked why she did not tell Mr. Herman about the Berks County program, her only response was "I really don't remember." *Id.* at 111.

We find that the City intentionally discriminated against the Mr. Herman by agreeing to rehire the Plaintiff upon certain conditions and then adding the requirement that he participate in a $7000 drug treatment program which the City knew he could not afford when a perfectly acceptable alternative drug treatment program existed which was, in fact, covered by the Plaintiff's insurance. The basis for the addition of this condition was not that Mr. Herman was still abusing Percocet or any other drug. In fact, the City's own specialists found that Plaintiff was no longer engaging in illegal drug use. The City added this onerous requirement because Mr. Herman tested positive for taking cough medicine that had been properly prescribed by his physician. And, Dr. Stolz only added this requirement after Ms. Lilly passed along the untruthful information that Plaintiff had failed a second drug test. Still, Plaintiff was more than willing to attend an intensive outpatient program—as long as it was within his budget. The program demanded by the City, however, was way beyond Mr. Herman's means. After determining that he could not pay for AOMC's program, Plaintiff put in the extra effort to find an equivalent program that his insurance would cover. He found a program administered by Mr. O'Donnell, which the City's own doctor stated was the functional equivalent of AOMC's program. When presented with such a program, the City said that he could not take Mr. O'Donnell's program. *Id.* at 107–08. And, though the City would have approved of the Berks County program, Ms. Lilly never communicated this to Mr. Herman.

Furthermore, Plaintiff presented evidence of the City's discriminatory motive for refusing to allow Mr. Herman to attend Mr. O'Donnell's drug program. Chief Novosat (Allentown's Fire Chief), after learning Plaintiff tested positive for cough syrup, stated that he "was disgusted, as well as, you know, any people [he] talked to saying what it is with this guy, we're giving him a chance to come back and he's dirty again." Tr. 9/22/97 at 63–64. In Chief Novosat's mind, Plaintiff was doing the same thing for which he was originally terminated. *Id.* at 64. Thus, according to Chief Novosat, he and Ms. Lilly were disgusted with the Plaintiff and considered Mr. Herman to be dirty again. While Mr. Herman offered to take a second drug test, the City never gave him the opportunity to take one. Yet, Ms. Lilly

falsely told Dr. Stolz that Plaintiff had in fact failed a second drug test. Based on the above-stated evidence, we are convinced that the City's adverse employment actions with regard to rehiring Mr. Herman were the result of discrimination based on the erroneous belief that Mr. Herman was using drugs illegally, despite the fact that the City's own experts stated otherwise. Defendant had no legitimate basis for that belief, yet the City's representatives intentionally discriminated against Mr. Herman because they perceived him as dirty and were disgusted with him.

Thus, we find that Plaintiff is a qualified person with a disability. According to 42 U.S.C. § 12114, a person who "is erroneously regarded as engaging in [the use of illegal drugs], but is not engaging in such use," shall be construed as a qualified individual with a disability. *See also Ackridge v. Commissioner, Department of Human Services—City of Philadelphia*, 1994 WL 184421, *1, *1–2 (E.D.Pa. May 5, 1994).

We further find that Plaintiff is qualified for the position of firefighter, in that he can perform the work with reasonable accommodations. Mr. Herman served as a firefighter for the City of Allentown between 1987 and 1994 and was promoted from reserveman, to pipeman, to front car driver. During his last three evaluations, Mr. Herman's work was rated as satisfactory. (Plaintiff's Ex. 1–3). Mr. O'Donnell stated that Plaintiff was cleared to go back to work. Dr. Stolz also had stated that Mr. O'Donnell was clear to go back to work immediately, until he was falsely told that Mr. Herman had failed a second drug test. Based on these facts we find that Mr. Herman was qualified for the position for which he was seeking to be rehired.

And, as we have already discussed, we believe that the City discriminated against the Plaintiff because of his disability: the fact that he was erroneously seen as engaging in illegal drug use. Thus, Plaintiff has met all three elements necessary to make his prima facie case.

Defendant, however, has provided no non-discriminatory reasons for its actions. Defendant fails to present any evidence explaining why Mr. O'Donnell's program was

inadequate, despite the fact that the City's own witness stated that Mr. O'Donnell's program was the functional equivalent of the AOMC's program. And, Ms. Lilly can give no excuse for why she failed to tell Mr. Herman that he could take the Berks County program. The fact of the matter is that the City has provided no explanation for why it forced the Plaintiff to comply with completely unreasonable conditions before he be rehired, after the City had already agreed with the Union to take Mr. Herman back.

We are sympathetic with the City's predicament. Indeed, the City was not required to rehire Mr. Herman under the ADA in the first place. But, once the City agreed to rehire the Plaintiff, it could not discriminate against the Plaintiff in the re-hiring process. We recognize that this might discourage the City from giving its employees a second chance in the future. The ADA, however, does not make exceptions for those employers trying to offer their employees a second chance. Thus, despite the city's noble intentions, we are required to find for the Plaintiff under the ADA.

### B. Defendant's Defenses Fail

Defendant asserts that we must decide in the City's favor because the settlement agreement, relied upon by the Plaintiff to prove his case, is inadmissible under Federal Rule of Evidence ("FRE") 408, and because the Plaintiff is not a qualified individual with a disability under the ADA. We disagree.

### 1. FRE 408 Does Not Bar the Settlement Agreement

Defendant argues that Plaintiff's case must fail because it is based upon settlement agreements which are barred by the Federal Rules of Evidence. We disagree.

Fed.R.Evid. 408 states that

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evi-

dence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Thus, "Rule 408 codifies the long-standing axiom in federal courts that compromises proposed or accepted are not evidence of an admission of the validity or invalidity of the claim or the amount of damage." 2 JACK. B. WEINSTEIN & MARGARET A. BURGER, WEINSTEIN'S FEDERAL EVIDENCE, § 408.03[1], at 408–10 (2nd ed.1997); *see also Affiliated Manufacturers, Inc. v. Aluminum Company of America,* 56 F.3d 521, 526 (3d Cir.1995) ("*Affiliated* "). The policy behind Rule 408 is to encourage parties to settle their cases. *See Affiliated,* 56 F.3d at 526. If a plaintiff could assume liability by offering to settle a case, there would be very few settlements. For example, in the paradigmatic Rule 408 case, a plaintiff who slipped and fell outside the defendant's home would be barred from introducing evidence that the defendant had offered to settle the case for $10,000. Without Rule 408, the defendant's offer to settle could be parlayed into proof of liability which would discourage the defendant from ever even considering settling the case.

The instant case is very different from the paradigmatic Rule 408 case. The settlement agreement at issue does not involve the instant ADA case. The defendant did not offer to settle the disability discrimination case which we are deciding today. In fact, the settlement agreement was not actually between the Plaintiff and the Defendant; it was between the City of Allentown and the International Association of Fire Fighters Local 302. (Plaintiff's Exs. 4 & 5). The settlement agreement relates to the Plaintiff's original

termination. The lawsuit relates to the Defendant's failure to rehire the Plaintiff. Thus, the settlement is not being offered into evidence to prove the validity of the claim that it settled—whether it was proper to dismiss the Plaintiff for his drug use. Instead, the agreement is being used to prove something completely different: that the Defendant discriminated against the Plaintiff in its failure to rehire the Plaintiff. *See Broadcort Capital Corporation v. Summa Medical Corporation,* 972 F.2d 1183, 1194 (10th Cir.1992)(admitted settlement evidence when the evidence related to an entirely different claim than the claim which was under negotiation); *Wyatt v. Security Inn Food & Beverage, Inc.,* 819 F.2d 69, 71 (4th Cir.1987)(Rule 408 does not prevent a litigant from offering settlement evidence when the litigant does not seek to show the validity or invalidity of the compromised claim); *Vulcan Hart Corporation (St. Louis Division) v. National Labor Relations Board,* 718 F.2d 269, 277 (8th Cir.1983)(Rule 408 only excludes evidence of settlement offers when that evidence is offered to prove the liability for or invalidity of the claim under negotiation); *Frieman v. USAir Group, Inc.,* 1994 WL 675221, *1, *9 (E.D.Pa. Nov.23, 1994)(suggesting that there is case law to support the proposition that Rule 408 does not bar admission of a settlement agreement that deals with a separate cause of action from the one at trial); *But see Lo Bosco v. Kure Engineering Limited,* 891 F.Supp. 1035, 1038 (D.N.J. 1995)(Rule 408 may exclude settlement proposals when the cases are related). Thus, since the claim under negotiation in the settlement is completely different than the claim at issue in the lawsuit, we refuse to bar this evidence from being considered.[1]

## 2. Plaintiff is a Qualified Individual With A Disability under the ADA

Defendant asserts that the court must find in favor of the defense because the Plaintiff has not presented sufficient evidence that he is a qualified individual under the ADA. The crux of the Defendant's argument appears to be that the Plaintiff has failed to show that

---

1. We also find that it would be patently unfair to preclude the admission of the settlement agreement when the actions that constitute the alleged

discrimination arise out of the Defendant's altering of the agreement.

he is not currently engaging in the use of illegal drugs. Defendant asserts that the "initial inquiry ... has to be whether or not Mr. Herman was a rehabilitated individual." *Defendant's Brief* at 12. The City argues that Plaintiff has presented no proof that he has gone through any rehabilitation program and no credible evidence of rehabilitation. *Id.* The City further asserts that it "acted on the drug use of the applicant, which would disqualify him from being a 'qualified individual with a disability.'" *Defendant's Brief* at 10. We disagree. Defendant cites to a section the ADA which address the illegal use of drugs and alcohol. This section of the statute states:

**(a) Qualified individual with a disability**

For purpose of this subchapter, the term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

**(b) Rules of construction**

Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who—

(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;

(2) is participating in a supervised rehabilitation program and is no longer engaging in such use;

(3) is erroneously regarded as *engaging in such use, but is not engaging in such use;*

except that it shall not be a violation of this chapter for a covered entity to adopt or administer *reasonable policies or procedures,* including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs. 42 U.S.C. § 12114 (emphasis added).

The Defendant claims that "the City acted on the drug use of the applicant, which would disqualify him from being a 'qualified individual with a disability.'" *Defendants Brief* at 10. This *is* not the case. The action that *is* the subject of this ADA suit is not the firing of the Plaintiff in the first place. We agree that the Defendant had every reason to fire the Plaintiff. But, that is not the issue in this case. The issue in this case is whether the Defendant discriminated against the Plaintiff through its actions that resulted in the failure to rehire the Plaintiff. At the time the city refused to rehire the Plaintiff, the evidence showed that Mr. Herman was no longer engaging in the illegal use of controlled substances. Mr. Herman testified that he stopped taking Percocet on the day he was arrested. Tr. 9/22/97 at 30. Plaintiff saw Mr. O'Donnell and Dr. Valella, who, according to the Plaintiff, helped him to get over his addiction. Furthermore, Mr. O'Donnell's and Dr. Stolz's reports both say that, at the time of their examinations of Mr. Herman, the Plaintiff was no longer using drugs illegally. (Plaintiff's Ex. 11, Defendant's Ex. 2). Defendant intentionally discriminated against Plaintiff based on an erroneous belief that he was engaging in the illegal use of drugs. The ADA specifically protects persons against this very type of discrimination. 42 U.S.C. § 12114.

Defendant points to *McDaniel v. Mississippi Baptist Medical Center,* 877 F.Supp. 321, 327–28 (S.D.Miss.1994), *aff'd* 74 F.3d 1238 (5th Cir.1995), to stand for the proposition that "'no longer engaging in such use' [should] be read to mean that the person has been in recovery long enough to have become stable." However, whereas the Plaintiff in *McDaniel* had abstained from drugs for a few weeks, Mr. Herman was diagnosed by Dr. Stolz as drug free approximately nine months after Plaintiff claims he stopped using drugs.[2] Thus, we disagree with Defendant's contention that there is no evidence

---

**2.** Plaintiff's assertion that he stopped using drugs immediately after his arrest in May of 1994 is substantiated by Mr. O'Donnell's evaluation of the Plaintiff as drug-free on May 12, 1994. (Plaintiff's Ex. 11).

that Mr. Herman was no longer illegally taking controlled substances at the time of the City's discriminatory conduct. Plaintiff is a qualified individual with a disability under 42 U.S.C. § 12114(b)(3): Mr. Herman was erroneously regarded as engaging in illegal drug use, but was not engaging in such use when the City discriminated against him. The City had no reasonable basis to believe that Plaintiff was using drugs illegally when they discriminated against him. Defendant used the fact that Plaintiff was taking cough medicine as a pretext to justify their intentional discrimination. Therefore, Defendant's second defense must fail, and we are required to find for the Plaintiff.

## C. Remedies

### 1. Injunctive Relief

42 U.S.C. § 2000e–5(g)(1) permits this court, upon a finding on intentional discrimination, to order "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees."[3] The Third Circuit has pronounced that reinstatement is the preferred remedy to avoid future loss of earnings. *Ellis v. Ringgold School District*, 832 F.2d 27, 30 (3d Cir.1987). Reinstatement is an "obvious form of relief to make the plaintiff whole and to relieve the plaintiff of the effects of discrimination." *Id.* A reinstatement order lays within the discretion of the district court and should be considered when requested by the plaintiff and when circumstances warrant its award. *Id.* Considering the circumstances of this case, we believe that the reinstatement of the Plaintiff to his former job as a firefighter would best serve to make him whole and redress the effects of the City's intentional discrimination. We will therefore order that the City reinstate the

Plaintiff to the Allentown Fire Department *immediately*, subject to the following conditions[4]:

(a) Plaintiff shall be reinstated to his former position as a firefighter with a salary of not less than the amount he would have otherwise earned in this position had he been reinstated on February 11, 1995, plus all benefits for an employee in that position today. Plaintiff shall have the same seniority that he would of had if he had been rehired on February 11, 1995. If the Plaintiff wishes to have pension credits for the period after February 11, 1995, he shall be required to make the employee contributions to the pension fund as required by the pension plan.

(b) Plaintiff will discuss with and get approval from Dr. Ralph Stolz (or another doctor authorized by the City) before taking any prescription drug.

(c) Plaintiff will provide the Fire Chief with written notification of any prescription drugs he is taking, naming the medication and identifying possible side effects.

(d) Plaintiff shall sign a release authorizing the release of all information concerning any future treatment under the EAP program.

(e) Plaintiff shall totally abstain from all mood-altering chemicals, not including alcohol or prescription drugs properly prescribed by a physician and approved of by Dr. Stolz (or another doctor authorized by the City) and reported to the Fire Chief.

(f) Plaintiff shall have one witnessed urine drug screen on a weekly basis (within 24–hour collection) for a period of three years. After three years, Plaintiff shall submit to a urine screen "on demand" for reasonable suspicion. The City will receive official results of all such drug screens. Plaintiff

3. This section applies in ADA cases, as directed by 42 U.S.C. § 12117(a).

4. We recognize that the City has a strong interest in making sure that its employees, especially its firefighters, are not using drugs illegally. We have incorporated the above listed requirements into our reinstatement order to protect the City's interests. Many of these requirements were taken from the two settlement agreements that led to this case. We considered requiring the Plaintiff to attend Narcotics Anonymous meetings and

complete an addiction program substantially similar to that offered by the AOMC. However, we do not believe that such a requirement is appropriate today. It has been more than three years since Plaintiff used drugs illegally. Requiring him to attend these programs would make little sense at this point and time. We feel that the City's interest in ensuring that the Plaintiff is no longer addicted to drugs will be met by the weekly supervised drug tests and the other safeguards which our order provides.

will be responsible to pay for all urine drug screens during this three year period. The City will have the right to discharge the Plaintiff if he tests positive for any illegal drug, or for any drug not prescribed by a physician, approved by Dr. Stolz (or another doctor approved by the City), or for which the Fire Chief has not been notified.

(g) The City shall have the right to discharge the Plaintiff immediately for any future drug related offense. The City will also be entitled to consider the Plaintiff's conduct that led to his dismissal as part of the Plaintiff's disciplinary record.

**2. Back Pay**

■ According to 42 U.S.C. §§ 12117(a) & 2000e–5(g)(1), the court may award the victim of intentional disability discrimination back pay. Plaintiffs, however, must attempt to mitigate damages in order to be entitled to back pay. *See* 42 U.S.C. § 2000e–5(g)(1); *Booker v. Taylor Milk Co., Inc.,* 64 F.3d 860, 864 (3d Cir.1995). The burden is on the employer to prove a plaintiff's failure to mitigate. *Booker,* 64 F.3d at 864.

Plaintiff admits that he did not try to seek work and mitigate damages until the beginning of June, 1995. *See Plaintiff's Proposed Findings of Fact and Conclusions of Law* at 8. Thus, Plaintiff is not entitled to back pay from the time the Defendant refused to rehire him in February, 1995 through the end of May 1995.

We find, however, that the Plaintiff attempted to mitigate damages since June of 1995, when his criminal record was expunged. Plaintiff applied for jobs at Twin County Cable, Kraft Foods, Service Electric Cable, Stroh's Brewery, GPU Energy, UPS, UGI Gas Company, Perrier Water, Parkland School District, the Jewish Day School, Yuenling Beer Company, Hamburg School District, Greenwich Township, Nestle Candy Company, Lebanon Cabinet Company, the Fleetwood Leather Company. Tr. 9/22/97 at 44–45. Plaintiff did in fact secure part-time employment with Wells Fargo Security. *Id.* at 44–48. Thus, Plaintiff is entitled to back

pay from June of 1995 until the present. We will, however, subtract the amount of money Plaintiff earned as security guard from his back pay award.

■ Defendant also owned and operated an engraving business while he was employed by the Fire Department. He continued to operate this business after he was dismissed. Plaintiff asserts that the monies he earned from his engraving business should not be set off from his back pay since he owned the business while he was employed by the Fire Department. We disagree. After Plaintiff was fired from his job with the City, Plaintiff was able to devote more time to his engraving business. Tr. 9/22/97 at 47. Though he earned money from this part-time job while he was a firefighter, he was, since his dismissal, able to devote most of his energies to this business. In fact, since he was laid off by the City, Plaintiff earned more than three-times more money from his engraving business than he did working for Wells Fargo. Thus, we find that Plaintiff's engraving work was another means by which he mitigated damages. We will therefore set off Plaintiff's back pay award by the amount of money earned by the Plaintiff from his engraving business.

At the time Plaintiff was discharged from the fire department in 1994, he was earning $33,000 a year ($2750/month).[5] *See* Tr. 9/22/97 at 43; (Plaintiff's Ex. 9). In 1995, between June and December, Plaintiff lost $19,250 in wages ($2,750/month X 7 months). He did, however, earn $2,940 as a security guard from June of 1995 through December of 1995. Tr. 9/22/97 at 47. Plaintiff also earned $14,300 in 1995 (an average of $1,191.67/month) from his engraving business. Thus, from June of 1995 through December of 1995, Plaintiff earned approximately $8,341.69 from his engraving business. We will therefore award Plaintiff **$7,968.31** ($1,138.33 a month) in back pay for 1995 ($19,250 [wages]—$2,940 [security guard]—$8,341.69 [engraving] ).

---

**5.** We calculate Plaintiff's back pay based on his 1994 salary because Plaintiff has not provided any evidence as to what his 1995, 1996, and 1997 salaries would have been had he not been discharged.

In 1996, Plaintiff lost $33,000 in wages ($2750/month X 12 months). Plaintiff earned $3,360 as a security guard and $8500 from his engraving business. Tr. 9/22/97 at 47. We will therefore award Plaintiff **$21,140** ($1,761.67 a month) in back pay for 1996 ($33,000 [wages]—$3,360 [security guard]—$8,500 [engraving] ).

In 1997, at the time of this opinion, Plaintiff lost $29,562.50 ($2,750/month X 10.75 months) in wages. Plaintiff has earned approximately $1,920 as a security guard and $6,200 from his engraving business. Tr. 9/22/97 at 47–48. We will therefore award Plaintiff **$21,442.50** ($1,994.65 a month) in back pay for 1997, up until the date of this decision ($29,562 [wages]—$1,920 [security guard]—$6,200 [engraving] ).

Thus, Plaintiff is entitled to **$50,550.81** in back pay as of today's date ($21,442.50 [1997] + $21,140 [1996] + $7,968.31 [1995] ).

### 3. Front Pay

Plaintiff is not entitled to front pay in light of the fact that he will be reinstated in his old job. However, in the event that the City cannot reinstate the Plaintiff immediately, he shall be entitled to receive his full salary and benefits, at a rate no less than what he would be entitled to had he been rehired by the City on February 11, 1995, while he is waiting to be reinstated.

### 4. Compensatory Damages

■ Plaintiff seeks compensatory damages for "future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment [sic] of life and other nonpecuniary losses allowable." *Complaint* at 7. 42 U.S.C. § 1981a(b) allows a court to award compensatory damages when a Defendant intentionally discriminates against a Plaintiff on the basis of Plaintiff's disability. We decline, however, to award Plaintiff compensatory damages in this case. We do not find that Plaintiff will suffer any future pecuniary loss—especially in light of our order that he be reinstated to the fire department. We also find that any pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life is not the fault of the City, but is the Plaintiff's own fault for abusing drugs

and for forging prescriptions in violation of the criminal law. So, while we will grant Plaintiff back pay, we decline to reward the Plaintiff for his own mistakes that led to his embarrassment, inconvenience and suffering.

### 5. Punitive Damages

■ Plaintiff has asked for punitive damages in his complaint. We will not provide Plaintiff punitive damages because he is not entitled to them since the Defendant, City of Allentown, is a municipality. "It is undisputed that under the ADA punitive damages are not available against a government agency." *Curran v. Philadelphia Housing Authority*, 1997 WL 587371, *1 (E.D.Pa. September 5, 1997); *see also Waring v. City of Philadelphia*, 1996 WL 208348, *1, *3 (E.D.Pa. April 26, 1996); 42 U.S.C. § 1981a(b)(1)(plaintiffs are entitled to seek punitive damages "against a respondent (*other than a government, government agency, or political subdivision* )")(emphasis added).

### 6. Interest

■ Plaintiff also seeks prejudgment and postjudgment interest. The decision to award prejudgment interest is "committed to the sound discretion of the district court." *Green v. USX Corp.*, 843 F.2d 1511, 1530 (3d Cir.1988), *vacated and remanded on other grounds*, 490 U.S. 1103, 109 S.Ct. 3151, 104 L.Ed.2d 1015 (1989). The award of prejudgment interest is appropriate in ADA cases. *See Corbett v. National Products Company*, 1995 WL 284248, *1, *5 (E.D.Pa. May 9, 1995). We conclude that the Plaintiff should receive prejudgment interest on his back pay. "[Plaintiff] has been out of pocket this money because of [the City's] wrongdoing. Fairness requires him to be made whole with the addition of interest." *Id.*

Like the court in *Corbett*, we believe that the appropriate measure of prejudgment interest is set forth in the postjudgment interest statute, 28 U.S.C. § 1961. *See Corbett*, 1995 WL 284248 at *5; *see also Weiss v. Parker Hannifan Corp.*, 747 F.Supp. 1118, 1133–34 (D.N.J.1990). The rate furnished by

that statute is the 52 week T–Bill rate. We will calculate the interest based the most recent T-bill rate at the time of judgment.[6] See Corbett, 1995 WL 284248 at *5. Interest will be based on the amount of back pay that accrued for each of the months between June of 1995 (when Plaintiff began to mitigate damages) and today.[7] Based on our calculations, we will award Plaintiff **$3175.90** in prejudgment interest. Plaintiff shall also be entitled to postjudgment interest at 5.42%.

### 7. Attorney's Fees

Plaintiff qualifies as the prevailing party pursuant to 42 U.S.C. § 2000e–5(k). Plaintiff shall be awarded reasonable attorney's fees and costs.

## IV. CONCLUSION

In conclusion, we find that the Defendant intentionally discriminated against the Plaintiff in violation of the ADA. We will order that the Defendant reinstate the Plaintiff as a firefighter consistent with the terms and conditions discussed in this opinion. We further award Plaintiff $50,550.81 in back pay and $3,175.90 in prejudgment interest. Postjudgment interest will be awarded at 5.42%. We do not award Plaintiff front pay, unless the Defendant fails to rehire Plaintiff immediately. In that case, Defendant will pay Plaintiff, until he is rehired, the full salary that he would be entitled to had he been rehired by the fire department on February 11, 1995. We will not award compensatory or punitive damages. Plaintiff shall be enti-

---

**6.** According to the Administrative Office of the United States Courts, the most recent interest rate at the time of this Decision was the 11/6/97 rate of 5.42%.

**7.** Parties have not provided us with a means to calculate the interest on the back pay. We have decided to calculate the interest based on the average monthly back pay. We will calculate simple interest, not compound interest, as the postjudgment interest statute directs. The following table calculates the interest for each month of back pay which the Plaintiff is due.

| DATE | ACCRUED BACK PAY AND INTEREST | RATE | INTEREST |
|---|---|---|---|
| 6/95 | $1138.33 | 5.42% | $5.14 |
| 7/95 | $2276.66 | 5.42% | $10.28 |
| 8/95 | $3414.99 | 5.42% | $15.42 |
| 9/95 | $4553.32 | 5.42% | $20.57 |
| 10/95 | $5691.65 | 5.42% | $25.70 |
| 11/95 | $6829.98 | 5.42% | $30.84 |
| 12/95 | $7968.31 | 5.42% | $36.00 |
| 1/96 | $9279.98 | 5.42% | $41.91 |
| 2/96 | $11,491.65 | 5.42% | $51.90 |
| 3/96 | $13,253.32 | 5.42% | $59.86 |
| 4/96 | $15,014.99 | 5.42% | $67.82 |
| 5/96 | $16,776.66 | 5.42% | $75.77 |
| 6/96 | $18,538.33 | 5.42% | $83.73 |
| 7/96 | $20,300.00 | 5.42% | $91.69 |
| 8/96 | $22,061.67 | 5.42% | $99.65 |
| 9/96 | $23,823.34 | 5.42% | $107.60 |
| 10/96 | $25,585.01 | 5.42% | $115.56 |
| 11/96 | $27,346.68 | 5.42% | $123.52 |
| 12/96 | $29,108.35 | 5.42% | $131.47 |
| 1/97 | $31,103.00 | 5.42% | $140.48 |
| 2/97 | $33,097.65 | 5.42% | $149.49 |
| 3/97 | $35,092.30 | 5.42% | $158.50 |
| 4/97 | $37,086.95 | 5.42% | $167.51 |
| 5/97 | $39,081.60 | 5.42% | $176.51 |
| 6/97 | $41,076.25 | 5.42% | $185.53 |
| 7/97 | $43,070.90 | 5.42% | $194.54 |
| 8/97 | $45,065.55 | 5.42% | $203.55 |
| 9/97 | $47,060.20 | 5.42% | $212.56 |
| 10/97 | $49,054.85 | 5.42% | $221.56 |
| 11/97* | $50,550.81 | 5.42% | $171.24 |

* Calculated for Only 3/4 of Month

**TOTAL INTEREST $3175.90**

tled to reasonable attorneys fees and costs consistent with 42 U.S.C. § 2000e–5(k).

An appropriate order follows.

## ORDER

AND NOW, on this 21st day of November, 1997, upon consideration of the evidence presented during trial on September 22, 1997; Plaintiff's Proposed Findings of Fact and Conclusions of Law and the Memorandum of Law, filed October 14, 1997; Defendant, City of Allentown's, Response to Plaintiff's Proposed Findings of Fact and Counter Statement of Facts and Conclusions of Law filed October 27, 1997; Defendant, City of Allentown's, Brief filed October 27, 1997; Plaintiff's Response to Defendant's Counter Statement of facts filed November 4, 1997; and Plaintiff's Rebuttal to Defendant's Brief filed November 4, 1997, it is hereby ORDERED and DECREED, consistent with the preceding Decision, which is incorporated herein by reference, that the Defendant, City of Allentown, reinstate the Plaintiff, David B. Herman, to the Allentown Fire Department *immediately,* subject to the following conditions:

(a) Plaintiff shall be reinstated to his former position as a firefighter with a salary of not less than the amount he would have otherwise earned in this position had he been reinstated on February 11, 1995, plus all benefits for an employee in that position today. Plaintiff shall have the same seniority that he would of had if he had been rehired on February 11, 1995. If the Plaintiff wishes to have pension credits for the period after February 11, 1995, he shall be required to make the employee contributions to the pension fund as required by the pension plan.

(b) Plaintiff will discuss with and get approval from Dr. Ralph Stolz (or another doctor authorized by the City) before taking any prescription drug.

(c) Plaintiff will provide the Fire Chief with written notification of any prescription drugs he is taking, naming the medication and identifying possible side effects.

(d) Plaintiff shall sign a release authorizing the release of all information concerning any future treatment under the EAP program.

(e) Plaintiff shall totally abstain from all mood-altering chemicals, not including alcohol or prescription drugs properly prescribed by a physician and approved of by Dr. Stolz (or another doctor authorized by the City) and reported to the Fire Chief.

(f) Plaintiff shall have one witnessed urine drug screen on a weekly basis (within 24-hour collection) for a period of three years. After three years, Plaintiff shall submit to a urine screen "on demand" for reasonable suspicion. The City will receive official results of all such drug screens. Plaintiff will be responsible to pay for all urine drug screens during this three year period. The City will have the right to discharge the Plaintiff if he tests positive for any illegal drug, or for any drug not prescribed by a physician, approved by Dr. Stolz (or another doctor approved by the City), or for which the Fire Chief has not been notified.

(g) The City shall have the right to discharge the Plaintiff immediately for any future drug related offense. The City will also be entitled to consider the Plaintiff's conduct that led to his dismissal as part of the Plaintiff's disciplinary record.

(h) In the event that the Defendant, City of Allentown, does not reinstate Plaintiff David B. Herman immediately, Defendant shall pay Plaintiff his full salary, no less than the amount he would have otherwise earned in this position had he been reinstated on February 11, 1995, plus all benefits for an employee in that position today, until he is reinstated.

It is hereby further ORDERED and DECREED, consistent with the preceding decision, that JUDGMENT IS ENTERED in favor of the Plaintiff, David B. Herman, and against the Defendant, the City of Allentown, in the total amount of $53,726.71. This award is composed of back pay and prejudgment interest. Plaintiff is awarded postjudgment interest at a rate of 5.42% in a manner consistent with the postjudgment interest statute, 28 U.S.C. § 1961. Plaintiff, as the prevailing party, is also awarded reasonable attorneys fees and costs consistent with

42 U.S.C. § 2000(e)–5(k). Plaintiff must submit a petition with the necessary verified exhibits.

This case is closed.