

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-5-1996

# Olson v. Gen Elec Astrospace

Precedential or Non-Precedential:

Docket 95-5480

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Olson v. Gen Elec Astrospace" (1996). *1996 Decisions.* Paper 6.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/6

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5480


JOHN OLSON,

Appellant

v.

GENERAL ELECTRIC ASTROSPACE aka
MARTIN-MARRIETTA ASTROSPACE


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


(Civil No. 94-1190)


Argued: March 22, 1996

Before: BECKER and McKEE, Circuit Judges,
and POLLAK, District Judge

(Opinion filed: December 5, 1996)


STEPHEN E. KLAUSNER, ESQ. (Argued)
JAMES P. MADDEN, ESQ.
Klausner & Hunter
P.O. Box 1012
63 E. High Street
Somerville, NJ 08876

Attorneys for Appellant


ROBERT H. BERNSTEIN, ESQ. (Argued)
Epstein, Becker & Green
The Legal Center
One Riverfront Plaza
Newark, NJ 07102

Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge:

John Olson, a former employee of General Electric Astrospace ("GE"), appeals the district court's grant of summary judgment in favor of GE on claims Olson filed under the Americans With Disabilities Act, 42 U.S.C. § 1210 et seq., ("ADA"), and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 et seq. The district court ruled that Olson failed to establish a prima facie case of discrimination under either the ADA or the LAD. We agree that Olson did not demonstrate that he was disabled or had a record of impairment under the ADA. However, we disagree that Olson did not demonstrate the existence of a material fact as to a perception of an impairment. Accordingly, we will affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

I.

John Olson began his employment with GE as a Senior Member, Technical Staff, in the Parts Engineering Department, on April 3, 1988. His job responsibilities generally included evaluating Non-Standard Part Approval Requests ("NSPARS") and writing Source Control Drawings ("SCDS") for microcircuits. Throughout most of this period, Olson reported to Dale Sansoni, Manager of Parts Engineering. Olson liked Sansoni and considered him a good supervisor.

On August 23, 1991, Sansoni prepared the only written performance appraisal of Olson's job performance at GE. It covered the period from December 1988 to August 1991. Sansoni gave Olson a rating of "2" on a scale of "1" to "5", with "5" being the highest score. Sansoni's appraisal noted that Olson "needed improvement." Olson apparently agreed with Sansoni's assessment.

In February of 1991, Olson was hospitalized for four months for depression. He returned to work in late May or early June of 1991 although Sansoni gave Olson as much time off from work as he needed.

On September 11, 1991, GE told Olson that he was being laid-off along with hundreds of others as part of a general reduction in force necessitated by adverse business conditions. A month later, on October 11, 1991, Olson was formally laid-off.

In August of 1992, a former co-worker told Olson that the position of Quality Assurance Specialist was opening at GE's East Windsor, New Jersey facility. The person hired as QA Specialist would report to Sansoni who was still the Manager of Parts Engineering. Olson was interested and telephoned Sansoni, who encouraged Olson to apply. On September 9, 1992, Olson submitted

his application to the GE Transition Center in Princeton, New Jersey.  The application was forwarded to Amy Levinson-Close, Human Relations Manager.

Initially, Olson was one of four applicants.  Sansoni interviewed Olson for the position on September 21, 1992.  GE contends that because Sansoni already knew Olson and was familiar with his work, the interview focused on Olson's experiences since being laid-off. Olson contends that during that interview, Sansoni asked him if he had any further medical developments, and that Sansoni was referring to Olson's 1991 hospitalization for depression.  Olson alleges that approximately one-third of the interview concerned Olson's health and marital status.

According to Olson, Sansoni discussed the medication Olson was taking, and a one month hospitalization that Olson had admitted himself to for testing.  Olson did not, however, tell Sansoni that he had also been tested for Multiple Personality Disorder.  Olson contends that he and Sansoni also discussed an overnight hospitalization that Olson had undergone in order to diagnose a possible sleep disorder.  Olson maintains that he told Sansoni that all of the tests had been negative, and that the doctors had informed him that the most likely diagnosis was simply a sleep disorder.  According to Olson, Sansoni told him that he would recommend that Olson be hired for the position and that he would not be interviewing the other applicants.

A few days after Sansoni interviewed Olson, a co-worker gave Sansoni the resume of Jeffrey Venditte.  Venditte and the co-worker who gave Sansoni the resume had previously worked together at Hughes Aircraft Company and the co-worker highly recommended Venditte to Sansoni.  About one week after Sansoni interviewed Olson, Sansoni interviewed Venditte.  Sansoni considered both Olson and Venditte qualified for the job, but recommended Venditte to Christina Eggert who was Sansoni's superior.  GE maintains that Sansoni believed that Venditte had better experience than Olson with respect to parts overstressing and failure analysis which were two principal job requirements. Sansoni also believed that Venditte's work at Hughes and ITT would be valuable to GE.  At ITT, Venditte had been on a team that was responsible for a database management system used by four major subcontractors of GE.  At Hughes, Venditte had been involved in resolving spacecraft part failures, and that experience was related to the job he would perform at GE.

Sansoni and Eggert discussed Olson's and Venditte's qualifications, but Ms. Eggert made the final decision.  Eggert agreed with Sansoni's recommendation and hired Venditte. GE claims that Eggert and Sansoni discussed neither Olson's previous hospitalization nor his health in arriving at a decision to hire Venditte.  On October 21, 1992, Sansoni telephoned Olson and told him that another candidate had been hired.

On November 4, 1992, Olson filed a complaint with the EEOC, alleging that he was not hired because of his "disability" in violation of the ADA.   The EEOC conducted an investigation and on December 13, 1993, issued a no-cause determination.

On March 11, 1994, Olson filed a complaint against GE alleging that GE did not hire him because of his disability or

perceived disability in violation of the ADA and the LAD. Olson alleges that his disability is "depression, sleep disorder and multiple personality disorder." Complaint ¶ 16.

After the pleadings were closed, GE filed a motion for summary judgment. The district court entered an Order granting summary judgment to GE and dismissing Olson's complaint with prejudice. In a Memorandum Opinion accompanying the Order, the district court held that Olson had not established a prima faciecase under the ADA or the LAD because he failed to establish that he is disabled, that he has a history of impairment or that GE perceives him to be disabled.

This appeal followed.

## II.

Summary judgment is proper only where there is no genuine issue of material fact for the factfinder to decide. Fed.R.Civ.P. 56(c). In order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant. Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 148 (3d Cir. 1993). Our standard of review on an appeal from a grant of summary judgment is plenary. Id. at 146. We apply the same test the district court should have used initially, Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 76 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991), and review the facts in the light most favorable to the party against whom summary judgment was entered. Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d at 146.

## III.

A. The ADA Claim.

The section of the ADA under which Olson brought his claim provides, in relevant part, as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

It is now axiomatic that the familiar analytical framework first pronounced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for resolution of suits brought under Title VII, also guides an analysis of claims brought under the ADA. Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995). Accordingly, Olson had the initial burden of establishing a prima facie case of unlawful discrimination. To do so he had to establish that (1) he belongs to a protected category; (2) he applied for and was qualified for a job for which the employer was seeking

applicants; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants.  Sheridan v. DuPont, ___ F.3d ___, No. 94-7509 (3d Cir. Nov. 14, 1996) (en banc), Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (discussing elements in a case of failure to hire or promote under Title VII).  In McDonnell Douglas, the court noted that "the facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to different factual situations."  411 U.S. at 802 n.13.  Olson's allegations reflect an alternative to the fourth element of the McDonnell Douglas scenario:  namely, a rejection of plaintiff accompanied, or followed by, a filling of the job with a person not belonging to the protected category.  If the plaintiff succeeds in establishing a prima facie case, the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection.  Id.  Once the employer articulates a legitimate reason for the unfavorable employment decision, the plaintiff must show by a preponderance of the evidence that the employer's proffered explanation was pretextual. Id.

In order to defeat a summary judgment motion after the defendant answers plaintiff's prima facie case with legitimate, nondiscriminatory reasons for its action, the plaintiff must

> point to some evidence, direct or
> circumstantial, from which a factfinder could
> reasonably either (1) disbelieve the
> employer's articulated legitimate reasons; or
> (2) believe that an invidious discriminatory
> reason was more likely than not a motivating
> or determinative cause of the employer's
> action.

Id. at 764.  The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Id. at 765 (internal citations, quotations and brackets omitted).  Once the plaintiff has pointed to some evidence which sufficiently discredits the employer's proffered reasons, plaintiff need not "also come forward with additional evidence of discrimination beyond his or her prima facie case."  Id. at 764.  Rather, the factfinder may consider the elements of plaintiff's prima facie case along with the rejection of the employer's explanation and conclude that illegal discrimination is more likely than not the true reason for the challenged employment action.  "It is the jury's determination that the reason given was pretextual together with the evidence that supported the prima facie case that will sustain a finding of intentional discrimination . . ."  Sheridan, slip. op. at 20.  The factfinder is not, however, compelled to so find, as the plaintiff always has the burden of proof.  Id. at 763.

However, before the burden-shifting can even begin, Olson must show that he is a member of a protected class.  Olson argues that he is a member of the protected class because he meets each of the three categories of protection under the ADA. He argues he: (1) is disabled because he was hospitalized for depression for four months; (2) has a record of impairment because of his hospitalization and because of his diagnoses of Multiple Personality Disorder and a sleep disorder; and (3) is regarded as disabled by GE.

The ADA defines the term "disability" as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  "Major Life Activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).  These activities are "substantially limit[ed]" when one is

> (i) Unable to perform a major life activity that the average person in the general population can perform;  or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  In determining if a person is affected by a disability that "substantially limits" a "major life activity" we must consider several factors including:

> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment;  and
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).  Our task is to determine if a person who claims a disability under the ADA is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). An "inability to perform a single, particular job does not constitute a substantial limitation in

the major life activity of working." Id.

In granting summary judgment for GE and against Olson, the district court held that Olson had failed to establish a prima facie case that he was disabled. The court stated:

> [c]onsidered separately or together, neither plaintiff's hospitalization nor his alleged emotional condition are enough to classify him as disabled for purposes of establishing a prima facie case under the ADA. Plaintiff has not demonstrated how, if at all, his alleged condition has impacted his life. On the contrary, plaintiff has indicated that he works, goes to school full time and regularly engages in recreational activities. The court therefore concludes that plaintiff has not made a prima facie showing that he is disabled.

Dist. Ct. Op. at 7.

Similarly the court denied Olson's claim that he had a record of impairment. In doing so, the court minimized the serious nature of Olson's depression and personality order. The court stated:

> Plaintiff has apparently misunderstood what is meant by 'a record of such impairment.' That subsection . . . is intended to ensure that people are not discriminated against because of a history of disability. This . . . is satisfied if a record relied on by an employer indicates that the individual has . . . had a substantially limiting impairment. . . . It is absolutely necessary for the plaintiff to show that the impairment . . . substantially limits one or more of the individual's major life activities. . . . [N]either a diagnosis of multiple personality disorder nor a history of testing for sleep disorders will satisfy that burden. Plaintiff would have to show that, while those disorders were active, they substantially limited one of life's major activities. He has not done so.

Dist. Ct. Op. at 7-8 (citations omitted).

Finally, the district court also concluded that Olson had not demonstrated that he was regarded or perceived as being disabled. It did so because Eggert, not Sansoni was responsible for not hiring Olson, and Olson could not demonstrate that Eggert knew of Olson's health problems. The court noted:

> Indeed, it is unlawful for an employer to base an employment decision on the belief that the employee is disabled. However,

> Christina Eggert, the individual who had the
> ultimate authority to make the hiring
> decision in question here, has certified that
> she did not discuss plaintiff's health with
> the interviewer and she was not aware that
> plaintiff suffered from depression, multiple
> personality disorder or any other type of
> mental illness. An employer cannot be said to
> have regarded an individual as disabled when
> the person charged with making the adverse
> employment decision lacked knowledge of the
> employee's condition.

Dist. Ct. Op. at 8 (citations omitted). The court therefore concluded that Olson "failed to show that he belongs to a protected class, a threshold requirement of the ADA." Dist. Ct. Op. at 9.

As noted earlier, we agree with the district court's conclusion that Olson did not show that he was either disabled or had a record of impairment within the meaning of the ADA. The evidence recited by the district court that reflects Olson's ability to function normally despite what appear to be serious psychological and emotional problems defeats that part of Olson's ADA claim. Accordingly, the evidence that was apparently offered to demonstrate Olson's fitness as an employee ironically establishes that he was not substantially limited in a major life activity. Therefore he can not establish that he is disabled, or that he has a history of being disabled. However, we believe that Olson clearly demonstrated a genuine issue of material fact as to the third basis of his ADA claim. A reasonable factfinder could conclude that he did not get the job because GE regardedhim as disabled.

The regulations provide that being "regarded as having such an impairment" means:

> (1) Has a physical or mental impairment that
> does not substantially limit major life
> activities but is treated by a covered entity
> as constituting such limitation;

> (2) Has a physical or mental impairment that
> substantially limits major life activities
> only as a result of the attitudes of others
> toward such impairment; or

> (3) Has none of the impairments defined in
> paragraphs (h)(1) or (2) of this section but
> is treated by a covered entity as having a
> substantially limiting impairment.

29 C.F.R. § 1630.2(l)(1)-(3). Thus, Olson would be disabled within the meaning of the ADA if GE regarded Olson as having a disabling impairment. See Holihan v. Lucky Stores, Inc., 87 F.3d 362, 366 (9th Cir. 1996).

Olson argues that it is reasonable to infer that GE perceived him to be disabled because at least one-third of his

interview with Sansoni was spent discussing Olson's health, and because Sansoni's performance evaluation of Olson during Olson's prior employment with GE contains the following references to Olson's health:

> John's time card charges are not always entered on a daily basis. On a number of occasions I have not signed his time card because he was out on personal illness. . . . His work habits are questionable because he has taken an unusual amount of time off for personal illness reasons.
>
> I have spoke (sic) to John on several occasions regarding his personal illness. I depend on John to perform as a senior member of my Technical Staff and I have questioned his commitment to Parts Engineering.
>
> A majority of John's appraisal was prepared back in March of this year (when it was originally due), however John went on extended illness from March, 1990 to June 1990 which caused this performance discussion to be delayed until now.

Appellant's App at 35, 36. Olson then appears to argue that because Sansoni reported to Eggert, a reasonable factfinder could conclude that Eggert was aware of Olson's health problems because of discussions she would most certainly have had with Sansoni.

In response GE points out that Eggert made the hiring decision, and she had no knowledge of Olson's health problems or history of hospitalizations. GE reminds us that Eggert's certification establishes that she never discussed Olson's health with Sansoni, and that Olson's own statements establish that GE was unaware of Olson's condition at the time Venditte was hired. Olson's affidavit to the EEOC is part of the record in the district Court. In that affidavit Olson swore:

> I wish to state for the record that I believe Mr. Sansoni's questions about my health and current marital status arose out of a sincere desire to re-establish a friendly relationship which we enjoyed prior to and following my layoff from GE.

Appellee's App. at 68. Similarly, Olson testified in his deposition that "I don't believe that [Sansoni], in fact, discriminated against me on the basis of my health during the interview in 1992." Appellee's App. at 38.

We agree that knowledge of Olson's hospitalization and illnesses cannot be imputed to Eggert. She filed a Certification disclaiming any such knowledge, and Olson presented no evidence to the contrary. Thus, the district court correctly concluded that Olson's theory of imputed knowledge was based upon sheer speculation, and was therefore insufficient to raise a genuine

issue of material fact.  However, we need not impute Sansoni's knowledge of Olson's hospitalization and illnesses to Eggert to find that Olson was perceived as disabled by GE.  The error here occurred precisely because the district court limited its inquiry to Eggert's knowledge of Olson's disability rather than considering Sansoni's perception. Sansoni was directly involved in the hiring process, and it is uncontroverted that he knew of Olson's health problems. It is also uncontroverted that he recommended Venditte, not Olson, to Eggert who then offered the position to Venditte.  Sansoni had been Olson's supervisor, and was aware of Olson's hospitalization and illnesses.  He prepared the only written evaluation of Olson's performance at GE, and in it Sansoni made multiple references to the fact that Olson had missed a significant amount of work because of illness.  He specifically stated that Olson had been hospitalized for four months, and he noted that he had discussed illness-related absences with Olson on several occasions. Moreover, these absences caused Sansoni to question Olson's commitment to his job.  Finally, it is undisputed that Sansoni spent a significant amount of time during Olson's interview discussing Olson's health problems.

Viewing these facts in the light most favorable to Olson as the nonmovant (as we must), it is clear that a reasonable fact-finder could infer that Sansoni perceived Olson to be disabled. One could reasonably conclude that this affected the recommendation Sansoni made to Eggert, and that that caused GE to hire Venditte.

Where a hiring decision is based largely or entirely on a recommendation or evaluation made by an employee who perceived the applicant as disabled, the employer can be held liable in a perception case. Thus, at least for summary judgment purposes, it is irrelevant whether Eggert knew of Olson's health problems or not. So long as Sansoni knew, and he clearly did, and so long as Eggert made her hiring decision based upon Sansoni's recommendation, there is a genuine issue of material fact as to whether GE perceived Olson as disabled.

Moreover, the cases that have found for the employer because the employer did not know of an employee's illness or condition are not to the contrary. In Geraci v. Moody-Tottrup, International, Inc., 82 F.3d 578 (3d Cir. 1996), a pregnancy discrimination suit under Title VII, the plaintiff offered no evidence that any of her managers knew she was pregnant. Therefore, even though she told some of her co-workers, absent evidence that someone in position of authority knew of her condition, she could not prevail against her employer. Similarly, in Hedberg v. Indiana Bell Telephone Co. Inc, 47 F.3d 928 (7th Cir. 1995), management relied upon a recommendation made by the plaintiff's supervisor in making the decision to fire the plaintiff. However, the supervisor's evaluation of the plaintiff was made before the supervisor knew of plaintiff's illness, and the plaintiff offered no evidence that any of the decisionmakers knew of his  illness when they fired him. In neither of these cases was the decision to discharge the plaintiff based largely or entirely upon a recommendation of a supervisor who knew of

plaintiff's condition.

Similarly, in determining whether Olson is a member of a protected class, it is irrelevant whether Olson believed that Sansoni did not discriminate against him during the interview. Olson's belief in Sansoni's sincerity does not establish that Sansoni's recommendation was not, in fact, altered by his view of Olson's health. Were summary judgment to be allowed on Olson's perception claim under such circumstances the already difficult task of proving discriminatory motive would be made significantly more difficult.

> The McDonnell Douglas-Burdine burden-shifting framework was created because only rarely will a plaintiff have direct evidence of discrimination. Gone are the days (if, indeed, they ever existed) when an employer would admit to firing an employee because she is a woman, over forty years of age, disabled or a member of a certain race or religion. . . . The elements of that prima facie case, however, must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.

Geraci, 82 F.3d at 581.

Viewing this record in the light most favorable to Olson, the nonmovant in summary judgment, it is clear that a genuine issue of material fact exists as to whether the recommendation that Sansoni made caused Venditte to be hired over Olson, and if so, whether that recommendation was affected by a perception that Olson was disabled within the meaning of § 12102(2)(C) of the ADA. Because the district court incorrectly ruled that Olson did not establish that there was a question of material fact as to whether he was regarded as disabled by GE, and thus a member of a protected class, we will reverse the district court's grant of summary judgment as to the issue of GE's perception of disability.

B. The LAD claim.

The section of New Jersey's Law Against Discrimination ("LAD") under which Olson brought his claim provides, in relevant part:

> the provisions of this act. . . prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped or any unlawful employment practice against such person, unless the nature and extent of the handicap reasonably precludes the performance of the particular employment.

N.J.S.A. 10:5-4.1. The LAD thus uses the term "handicap" as opposed to "disability". The district court did not discuss

Olson's LAD claim because it ruled that its holding that Olson had not established a claim under the ADA also defeated his claim under the LAD.  The court stated, "[f]or the same reasons that plaintiff has failed to establish that he is disabled under the ADA, he has likewise failed to establish that he is within the class of persons protected by the LAD." Dist. Ct. Op. at 9, n.2.

It is clear that the same McDonnell Douglas framework that guides us under the ADA would also guide a New Jersey court under the LAD. See  McKenna v. Pacific Rail Service, 32 F.3d 820, 824 (3d Cir.1994); Waldron v. SL Industries, Inc., 56 F.3d 491, 503–504 (3d Cir. 1995); Andersen v. Exxon Co., U.S.A., 446 A.2d 486, 490–491 (N.J.  1982); Kelly v. Bally's Grand, Inc., 667 A.2d 355, 359 (N.J. Super. Ct. App. Div. 1995); Grigoletti v. Ortho Pharmaceutical Corp., 570 A.2d 903 (N.J. Sup. Ct. 1990).  It is not nearly so clear, however, whether a "disability" under the ADA is the same as a "handicap" under the LAD.

Olson argues that the LAD standard for demonstrating a "handicap" is much less stringent than the standard for demonstrating a "disability" under the ADA.  Specifically, he contends there is no requirement under the LAD that a handicap "substantially limit one or more of the major life activities" of an individual.

In Andersen v. Exxon Co., U.S.A., 446 A.2d 486 (N.J. Sup. Ct. 1982), the New Jersey Supreme Court, rejecting a construction of the LAD that would make it applicable only to severe disabilities, wrote:

> We need not limit this remedial legislation to the halt, the maimed or the blind.  The law prohibits unlawful discrimination against those suffering from physical disability.  As remedial legislation, the [LAD] should be construed with that high degree of liberality which comports with the preeminent social significance of its purposes and objects.  Since the inception of the [LAD], our courts have repeatedly recognized its humanitarian concerns, its remedial nature and the liberal construction accorded it.  The paramount purpose of the statute is to secure to handicapped individuals full and equal access to society, bounded only by the actual physical limits that they cannot surmount. .  . . [I]t would be ironic indeed for the individual only slightly handicapped to be denied coverage under the act while more restricted individuals are accorded protection.  The statute speaks in terms of any physical disability.  There is simply no basis for limiting its coverage to so-called severe disabilities.

446 A.2d at 492 (citations and internal quotations omitted).  Although the circumstances in Andersen caused the court to speak in terms of physical handicaps, the actual language of the LAD

encompasses more than physical impairment.  The LAD provides, in relevant part, as follows:

> "Handicapped" means suffering . . . from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

N.J.S.A. 10:5-5(q)(emphasis added).

Thus, it appears that Olson would be suffering from a handicap under the LAD if his depression, his sleep disorder or his multiple personality disorder, singly or in combination, would prevent the normal exercise of his bodily or mental functions (as may be required under the ADA's substantial limitation of a major life function) or if the disability is diagnosed under medically accepted techniques.  Accordingly, it may be that the LAD does not require that Olson demonstrate that his depression, sleep disorder, or multiple personality disorder "substantially limit[] one or more of [his] major life activities."  42 U.S.C. § 12102(2)(A), and that Olson can be handicapped under the LAD without being disabled under the ADA.  However, we need not decide that issue now.  Upon remand, the district court will be able to resolve the LAD claim after reviewing additional briefs of the parties and the latest New Jersey authority.  We regret, however, that that determination must of necessity (given the absence of a certification procedure in New Jersey) be based upon a federal court's assessment of the current state of New Jersey law.

IV.

For the above reasons, we will affirm the district court's grant of summary judgment to GE on Olson's claim under the ADA based on the district court's findings that Olson did not demonstrate that he was disabled or had a record of impairment.  However, we will reverse the grant of summary judgment to GE on Olson's ADA claim that GE regarded him as disabled and remand on that issue only.  We will also reverse the grant of summary judgment to GE on Olson's LAD claim and remand for the district court to consider whether Olson demonstrated that he is handicapped as defined in the LAD.