Ralph V. VARELA, Plaintiff,

v.

PHILADELPHIA NEIGHBORHOOD HOUSING SERVICES, INC., et al., Defendants.

No. CIV.A. 98–CV–2994.

United States District Court,
E.D. Pennsylvania.

Oct. 21, 1999.

Edward J. Carreiro, Jr., Hatboro, PA, for Ralph V. Varela, Plaintiff.

Joseph Goldberg, Independence Square West, Tracy Tefankjian, Tracy Ann Walsh, Margolis, Edelstein and Scherlis, Philadelphia, PA, for Philadelphia Neighborhood Housing Services, Inc., Bernard Hawkins, Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

## I. INTRODUCTION

Presently before the court is defendants, Philadelphia Neighborhood Housing Services, Inc. ("PNHS") and Bernard Hawkins' (collectively "defendants") motion for summary judgment. Plaintiff brought this action against PNHS, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* In addition, plaintiff alleges a violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.Stat. § 851 *et seq.* against PNHS and its Executive Director Bernard Hawkins ("Hawkins"). Plaintiff seeks injunctive relief and to recover compensatory damages, back pay and front pay for losses he claims to have suffered as a result of the alleged discrimination by PNHS and Hawkins.

Defendants contend that plaintiff's discrimination claim against PNHS must fail since PNHS granted all of plaintiff's accommodation requests. In addition, defendants further argue that after it accommodated plaintiff, PNHS subsequently terminated plaintiff for legitimate, nondiscriminatory reasons. Furthermore, defen-

dant Hawkins claims that plaintiff's PHRA claim against also must fail because the PHRA does not create individual liability. Because plaintiff has failed to raise a genuine issue of material fact whether defendants granted plaintiff's accommodation requests and failed to produce sufficient evidence to rebut defendants' proffered reasons for termination, the court will grant defendants' motion.

## II. FACTS

The following facts are not in dispute or are construed in the light most favorable to plaintiff. In November of 1995, plaintiff began his employment with PNHS as a rehabilitation specialist.[1] According to PNHS' Human Resource Policy Manual, all employees were to begin their work day between 8:30 a.m. and 9:00 a.m., and complete the work day between 5:00 p.m. and 5:30 p.m. Further, all employees were required to take a one-hour unpaid lunch break between the hours of 12:00 p.m. and 2:00 p.m. PNHS further required all employee to secure, in advance, approval from PNHS' Executive Director for all other work hours or schedules. Although PNHS' personnel policies provided for these specific working hours, an employee's schedule would often require adjusting due the schedules of the residents or contractors.[2]

On January 26, 1996, after working at PNHS for a little over three months, plain-tiff received a written "60 Day Evaluation" from his immediate supervisor, Samantha Morse ("Morse"). In the evaluation, Morse stated, *inter alia*, that plaintiff: performed his job with "enthusiasm"; "showed concern for getting a quality product from the contractors"; "learned the paper work quickly"; and was "neat and accurate" in his record keeping. Defs.' Mot. for Summ. J., Ex. N at 1. However, in addition to these complementary words, Morse also described some areas where plaintiff needed improvement. Morse stated that plaintiff needed to "manage [his] time as efficiently as possible" because getting certain tasks accomplished had "been a challenge for [him] to complete in a timely fashion . . . ." *Id.* In addition, since plaintiff apparently had been confused about his work schedule, Morse reiterated PNHS' policies regarding the hours defendants expected plaintiff to work.[3] Morse also outlined a suggested work schedule that plaintiff could follow to better allocate his time. *Id.*

On June 23, 1996, approximately eight months into his employment with PNHS, plaintiff received a Disciplinary Memo from Morse, warning him that he was in violation of PNHS policy and if the conduct continued, PNHS would be forced to take disciplinary action. Defs.' Mot. for Summ. J., Ex. P. Specifically, Morse advised plaintiff that six hours of compensa-

---

1. PNHS is a private non-profit corporation "whose goal is to stop the process of disinvestment and deterioration of Philadelphia's older residential neighborhoods through housing rehabilitation and stabilization." Defs.' Mot. for Summ. J., Ex. C. To achieve this goal, PNHS employs rehabilitation specialists to provide technical assistance to homeowners in home improvement projects, promote block improvements, prepare specifications and material orders for block projects and individual home improvements, administer the bid process, monitor and manage the contractor's work, assist in PNHS' annual planning, and perform related administrative work. *See* Defs.' Mot. for Summ. J., Ex. D.

2. In any event, the required number of work hours for a full time employee over a two week payroll period was 75 hours. In addition to requiring an employee to request in advance permission to modify the working hours and schedule, PNHS also required an employee to request in advance permission to treat any hours worked in excess of the required 75 hours as compensatory time to be accumulated for future use as paid leave time. *See* Defs.' Mot. for Summ. J., Ex. F.

3. Morse stated that "[f]lex time is to be taken within the pay period if you work overtime on a project with your supervisor's permission. Flex time is not to be used as a vehicle for creating a separate work schedule outside the regular work hours as delineated in the Human Resource Policy." *Id.* at 2.

tory time was being denied due to plaintiff's continued failure to follow the rules and procedures of the office. Plaintiff was cited for: listing a start time of 7:00 a.m. after explicitly being told not to do so; continued lack of follow-through in calling to the office to report late arrivals or absences; continued lack of follow through on taking lunch at the prescribed times throughout the week; continued prolonged field visits which had not resulted in jobs being completed in a timely fashion; the need for constant supervisory oversight in order to receive any requested work; and continued inaccurate return times listed on the sign-out sheets with no follow-up phone calls. *Id.*

As documented in the disciplinary memorandum, PNHS imposed the following requirements upon plaintiff in order to rectify the situation: promptly report any late arrivals to the office to plaintiff's immediate supervisor by 9:00 a.m.; the timely submissions of write-ups and invoices; the completion of assigned tasks within the specified deadlines without reminders; more consistent time management; the scheduling of work such that the hours would average 7.5 hours a day, Monday through Friday, rather than nine or ten hours one day and three hours the next; and the taking of a one-hour lunch period during the specified time. *Id.* at 2. PNHS further warned plaintiff that lack of compliance with these expectations would result in reassignment of plaintiff's position to probationary status for thirty days. *Id.*

Apparently as a result of plaintiff's failure to comply with the requirements of the June 23, 1996 disciplinary memorandum, PNHS placed plaintiff on probationary status on July 11, 1996. Defs.' Mot. for

Summ. J., Ex. R. In a memorandum to plaintiff, Hawkins, PNHS' Executive Director, specifically informed plaintiff that he was being placed on probation for various infractions, including: his failure to comply with company policy regarding communication with his supervisor on use and approval of leave time; his misuse of flex time; his failure to give notice of his whereabouts during the work day; his failure to follow established procedures in his completion of assignments; and his failure to comply with his supervisors' instructions regarding scheduling of appointments and documentation of expenses. *Id.* PNHS warned that failure to appropriately respond to these issues would result in termination. *Id.*[4] However, on August 11, 1996, PNHS lifted plaintiff's probationary status because plaintiff had "successfully completed the requirements of [his] probation." Defs.' Mot. for Summ. J., Ex. S.[5]

On November 5, 1996, plaintiff suffered a heart attack and was absent from work for about three weeks. Before PNHS allowed plaintiff to return to work, they required plaintiff to submit documentation from his primary physician which outlined the activities that plaintiff could safely engage in once he returned to work. In response, on November 23, 1996, plaintiff's physician stated that plaintiff could return to work with the following conditions: that he be exempted from roof work, that his outside work be limited to thirty minutes, and that he should avoid stressful situations. With these limitations, plaintiff returned to work on November 25, 1996.

After returning to work in November of 1996, plaintiff requested in writing, on December 18, 1996, an accommodation that allowed him to modify his work schedule.[6]

---

**4.** Plaintiff was given a number of requirements to follow in order to be in compliance with PNHS policies and procedures, including: adherence to a work schedule between 8:30 a.m. and 5:30 p.m., unless approved in writing in advance by a supervisor; prior approval by a supervisor of all leave time; and the immediate reporting of any sick or personal leave to a supervisor. *Id.* at 2.

**5.** Although plaintiff did not receive any formal written reprimands between August 11, 1996 and the end of that year, various supervisors testified that plaintiff's problems continued.

**6.** Plaintiff's submitted his written request following a meeting he had with Morse and Mr. Hamid ("Hamid"), the Director of Rehabilitation and Development, to discuss his work

Specifically, plaintiff requested that for the next four months, PNHS allow him to skip the daily mandatory one-hour lunch period and leave work at 3:30 p.m. Defs.' Mot. for Summ. J., Ex. X. Plaintiff's reasons for the request were to escape the stressful rush hour traffic and shorten his work time to permit him to take the rest required after his heart attack. It is undisputed that PNHS granted this accommodation and modified his work schedule accordingly.[7]

On·February 19, 1997, plaintiff was absent from work in order to attend a doctor's appointment. When Morse could not locate plaintiff, Hawkins instructed Morse to contact plaintiff's home to determine his whereabouts. Morse spoke with plaintiff's wife, who apparently became very upset with Morse's questioning. The next day, on February 20, 1997, plaintiff returned to work and confronted Morse regarding her conversation with plaintiff's wife. Plaintiff and Morse engaged in a heated and loud conversation in front other employees of PNHS.

Morse reported the details of the confrontation to Hamid and Hawkins. At Hawkins' request, Morse prepared an incident report describing the events which had occurred on that date. In addition to describing the incident, Morse also noted in the report plaintiff's continued failure to adhere to his accommodated schedule following his return from his heart attack. Due to plaintiff's insubordination and ongoing noncompliance with PNHS' policies,

Morse recommended that PNHS terminate plaintiff's employment. *See* Defs.' Mot. for Summ. J., Ex. W.

On February 21, 1997, PNHS issued plaintiff a written official personnel reprimand. Defs.' Mot. for Summ. J., Ex. Z. In the reprimand, to which Morse's incident report was attached, PNHS informed plaintiff that he was being reprimanded for his blatant insubordination and that the reprimand was just short of termination. *Id.* Further, PNHS again outlined the job requirements that plaintiff must follow without deviation in order to avoid termination. *Id.*[8]

On March 3, 1997, plaintiff requested in writing that he be permitted to leave work by 1:30 p.m., three days per week to attend cardiac rehabilitation. Defs.' Mot. for Summ. J., Ex. BB. Specifically, plaintiff requested that for the next six weeks, he be permitted to charge two hours of vacation time every Monday, Wednesday and · Friday so he could leave work two hours early. *Id.* The next day, on March 4, 1997, Hawkins approved plaintiff's request in writing. Defs.' Mot. for Summ. J., Ex. Y. Moreover, since plaintiff did not have sick leave or vacation time available, PNHS permitted plaintiff to take unpaid leave to attend his cardiac therapy. *Id.*

Hawkins also informed plaintiff in the March 4, 1996 letter, that as a result of his confrontation with Morse, his employment status was under review and ordered

schedule. Apparently, after plaintiff return to work following his heart attack, he started using comp, flex and unaccrued vacation time to cover needed doctor visits and to take time to recuperate, all in violation of company policies. *See* Defs.' Mot. for Summ. J., Ex. W. In fact, on December 13, 1996, Hawkins distributed a memorandum to plaintiff's supervisors advising them that no further vacation time should be approved for plaintiff and that plaintiff is required to obtain a doctor's note if all the absences were for medical reasons. Thus, Morse and Hamid meet with plaintiff to work out a schedule with him that would allow him to conform with PNHS' policies and attend to his medical needs.

7. Following his return to work and receiving the first accommodation, plaintiff received a annual performance review on December 24, 1996. In the review, PNHS rated plaintiff as an overall good employee with strong work habits and characterized plaintiff as a "good addition to the Rehab Department Staff." Pl.'s Mot. for Summ. J., Ex. G. However, PNHS again questioned plaintiff's ability to effectively manage his time and his continued misuse of sign out sheets. *Id.*

8. These requirements included a description of plaintiff's working hours with his requested accommodation of not taking a lunch and leaving at 3:30 p.m.

plaintiff to report directly to Mr. Hamid pending resolution of his employment status.[9] After further discussing plaintiff's employment status with two PNHS Board Members, Hawkins decided to terminate plaintiff. On March 17, 1997, Hawkins called plaintiff into his office, handed plaintiff a document entitled "Notice of Termination of Employment" and formally terminated plaintiff from employment with PNHS. *See* Defs.' Mot. for Summ. J., Ex. FF. PNHS' alleged reasons for terminating plaintiff were plaintiff's blatant insubordination and continued failure to adhere to company policies and procedures. *Id.;* *see also* Pl.'s Mot. for Summ. J., Ex. L.[10]

## III. LEGAL STANDARD

Summary judgment is appropriate if the moving party can "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must accept the non-movant's version of the facts as true, and resolve conflicts in the non-movant's favor. *Big Apple BMW, Inc. v. BMW of N. Amer.,*

*Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has done so, however, the non-moving party cannot rest on its pleadings. *See* Fed.R.Civ.P. 56(e). Rather, the non-movant must then "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir.1992); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

 The ADA, 42 U.S.C. §§ 12101–12213, prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).[11] As in other discrimi-

---

**9.** Plaintiff contends that on March 3, 1997, Mr. Hawkins verbally notified plaintiff of his termination and confirmed such action in the March 4, 1997 written notice. The only record evidence that plaintiff cites to support the contention that he was orally terminated on March 3 is the March 4, 1997 memorandum. *See* Pl.'s Mot. for Summ. J. at 9. This evidence, however, does not support such a conclusion. The March 4, 1997 memorandum stated that his employment status was under review and that, in the interim, he could attend cardiac therapy as unpaid leave. *Id.* It is further undisputed that plaintiff continued to report to work after March 3, 1997, with defendants' knowledge until he was terminated on March 17, 1997.

**10.** The Notice of Termination of Employment stated, in pertinent part:

This is notification of your dismissal from employment at Philadelphia Neighborhood

Housing Services, Inc. effective immediately. You have repeatedly operated outside of current policies and have been insubordinate in your interactions with your supervisor. You have demonstrated a continuing pattern of insubordination which is unacceptable, and can no longer be tolerated. Based on the foregoing, your continued employment at PNHS is not considered in the best interest of the organization.

Defs.' Mot. for Summ. J., Ex. FF.

**11.** The PHRA has definitions that are exactly the same as the ADA. Therefore, this court will not address plaintiff's PHRA claim against PNHS since the discussion of the ADA claim will dispose of the PHRA claim as well. *See Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 935 n. 1 (3d Cir.1997) (*citing Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996)).

nation statutes, the plaintiff has "the initial burden of establishing a prima facie case of unlawful discrimination." *Olson v. General Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir.1996) (*citing Sheridan v. E.I. Du-Pont de Nemours and Co.,* 100 F.3d 1061 (3d Cir.1996), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997)). To establish a prima facie case, a plaintiff seeking relief under the ADA must show that: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he was discharged. *See, e.g., Olson,* 101 F.3d at 951; *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998) (*citing Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996)). Defendants argue that plaintiff's discrimination claim must fail because each of plaintiff's request for accommodation were granted, thus he did not suffer an adverse employment decision. Furthermore, defendants contend that PNHS' ultimate decision to terminate plaintiff was based on legitimate, nondiscriminatory reasons, and not his disability.[12]

### A. *Reasonable Accommodation.*

■ Under the ADA, an employer must make reasonable accommodations to the "known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employ-

ee." 42 U.S.C. § 12112(b)(3). A reasonable accommodation may include job restructuring or work schedule modification. 42 U.S.C. § 12111(9). "An employer discriminates against a qualified individual when it does 'not make[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].' " *Gaul,* 134 F.3d at 580 (*citing* 42 U.S.C. § 12112(b)(5)(A)). Thus, an employer's failure to reasonably accommodate the otherwise qualified employee constitutes an adverse employment decision prohibited under the ADA. 42 U.S.C. § 12112; *Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 69 (3d Cir.1996).

■ It is undisputed that plaintiff requested the following two accommodations after returning to work from his absence due to his heart attack: the first request on December 18, 1996, to modify his working hours by permitting plaintiff to work through the lunch hour and ending his day one hour earlier; and the second request on March 3, 1997, to permit plaintiff to leave work early three days a week to attend cardiac rehabilitation. It is also undisputed that defendant granted the first request for accommodation by modifying plaintiff's work hours. Thus, the

---

12. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A person is "substantially limited" if he cannot perform a major life activity or is significantly restricted in the performance of such activity. *See* 29 C.F.R. § 1630.2(j)(1). Defendants do not dispute that plaintiff's cardiac condition can qualify as a disability under the ADA. *See* Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. at 3–4.

As for the second prong, "[a] two-part test is used to determine whether someone is a 'qualified individual with a disability.' "

*Gaul,* 134 F.3d at 580 (*citing* 29 C.F.R. pt. 1630, App. at 353–54). First, a court should determine whether the disabled individual can perform all the requisite job function without accommodation. *Gaul,* 134 F.3d at 580. If the individual cannot perform all the job functions without an accommodation, then the court must determine whether there exists any reasonable accommodation to which the individual would be entitled that would enable him or her to perform the essential functions of the position. *Id.* Defendants do not dispute that plaintiff possessed the requisite skills for the rehabilitation specialist position with or without an accommodation. *See* Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Summ. J. at 3. Thus, plaintiff has satisfied the first two prongs of the test.

only dispute is whether PNHS granted plaintiff's second request.

Defendants argue that the record evidence clearly shows that PNHS granted plaintiff's second request for accommodation on March 4, 1997. In contrast, plaintiff contends that despite what Hawkins stated in the March 4, 1997 memorandum, his request was denied and in fact, instead of granting the accommodation, Hawkins verbally terminated plaintiff. This court concludes that plaintiff has failed to raise a genuine issue of material fact regarding this issue. The only evidence plaintiff offers to support his contention that PNHS did not grant his second request for accommodation is the same March 4, 1997 memorandum which defendants assert supports its position. *See* Pl.'s Mot. for Summ. J. at 9. However, the March 4, 1997 memorandum unambiguously stated that plaintiff's request for medical leave was granted. It is unclear how the fact that plaintiff's employment status was still "under review" would modify the grant of plaintiff's accommodation. Since plaintiff has offered no other admissible evidence, *i.e.,* deposition testimony, affidavits, answers to interrogatories or admissions, *see* Fed.R.Civ.P. 56(c), to support his contention that his second request was not granted and refute the clear language of the March 4, 1997 memorandum granting the medical leave, no genuine issue of material fact with regard to plaintiff's accommodation claim remains. Thus, plaintiff's claim under the ADA that defendants failed to reasonably accommodate plaintiff must fail.

**13.** As discussed above, *see infra* n. 12, plaintiff has satisfied the first two prongs of the prima facie case. Further, it is undisputed that plaintiff was terminated, thus satisfying the final criteria and establishing a prima facie case. Defendants argue, citing *Gaul,* that plaintiff has failed to establish a prima facie case because plaintiff has been unable to show that PNHS' decision to terminate plaintiff was made on the basis of plaintiff's disability. *See* Defs.' Mot. for Summ. J. at 24.

**B. *Legitimate, Nondiscriminatory reasons.***

Defendants next argue that plaintiff's claim under the ADA must fail because PNHS terminated plaintiff for legitimate, nondiscriminatory reasons. Once plaintiff succeeds in establishing a prima facie case,[13] "the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for plaintiff's [termination]." *Olson,* 101 F.3d at 951 (*citing McDonnell Douglas v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In order to satisfy its burden of production, the defendant need only "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994).

PNHS has articulated two legitimate, nondiscriminatory reasons for its decision to discharge plaintiff. First, PNHS contends that plaintiff repeatedly failed to comply with company rules and procedures. *See* Defs.' Mot. for Summ. J. at p. 24 & Ex. FF. Second, PNHS contends that plaintiff was fired for his insubordination toward his supervisor. *Id.* at p. 26 & Ex. FF. Both of these reasons were outlined in the notice of termination plaintiff received on March 17, 1997. In addition, defendants have produced three other documented instances where plaintiff was cited or disciplined for his failure to follow company policy and procedures. *See* Defs.' Mot. for Summ. J., Exs. N, P & R. This evidence is sufficient to show legitimate, nondiscriminatory reasons for the firing and serves to rebut plaintiff's prima facie

Defendants have mistakenly placed the burden of proving that discrimination was the reason for the discharge as part of plaintiff's initial burden. To satisfy the third prong and establish a prima facie case, plaintiff only needs to prove that he was discharged. *See Olson,* 101 F.3d at 951. Once plaintiff establishes the prima facie case, then the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for plaintiff's termination. *Id.*

case. Thus, defendants have satisfied its burden of production.

### C. *Plaintiff's evidence of pretext.*

 After the plaintiff has established a prima facie case and the defendant has articulated a legitimate, nondiscriminatory reason for the termination, " 'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir.1993) (*citing Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (*citing McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817). "[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, nondiscriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. In other words, a "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence ... and infer that the employer did not act for [the asserted] nondiscriminatory reasons." *Id.* at 765 (citations omitted). The Third Circuit has held that "factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." *Josey*, 996 F.2d at 638–39.

Plaintiff presents two basic arguments which he believes show that defendants' reasons for terminating plaintiff were pretextual. First, plaintiff appears to argue that defendants lack documentation which shows that defendants were dissatisfied with plaintiff's work. Second, plaintiff apparently contends that contradictions between various PNHS supervisors' testimony concerning the reasons for dismissing plaintiff renders the evidence presented by plaintiff not credible. Both of these arguments, however, incorrectly assume that defendants' reason for firing plaintiff was based solely upon the alleged inferior quality of plaintiff's work.

It is true that defendants did not document a problem with the quality of plaintiff's work before or after his heart attack. In fact, in his sixty day evaluation which occurred before his heart attack and his annual performance review which was conducted after he returned to work immediately following his heart attack, defendants complimented plaintiff's work product. *See* Exs. G & N. Further, plaintiff has presented evidence of contradictions in the testimony of PNHS supervisors regarding the quality of plaintiff's work. Even assuming plaintiff's evidence to be true, plaintiff's arguments fail to address the two legitimate, nondiscriminatory reasons which defendants have proffered from the beginning: that plaintiff continually did not comply with company rules and procedures and that plaintiff was fired for his insubordination toward his supervisors. *See Meachum v. Temple Univ.*, 42 F.Supp.2d 533, 539 (E.D.Pa. 1999) (concluding that in order to survive summary judgment, it is not enough for plaintiff to discredit one of defendants proffered explanations for firing, but must offer evidence rebutting each of defendants' reasons) (*citing Fuentes*, 32 F.3d at 764).

Plaintiff offers no evidence to rebut the fact that PNHS has provided documentation supporting its claim that plaintiff continually failed to comply with company policy. The record shows that early in plaintiff's employment with PNHS, before

his heart attack, defendants were concerned with plaintiff's noncompliance with company policies. Defendants repeatedly reminded plaintiff about PNHS' procedures and policies and warned plaintiff that it would impose some form of discipline if the conduct continued. In fact, five months prior to his heart attack, he was placed on probationary status for his continued violations. Even after plaintiff returned to work, defendants continued to document plaintiff's noncompliance with PNHS policies and procedures regarding his work hours and schedule. Plaintiff has failed to offer sufficient evidence from which a factfinder could reasonably disbelieve PNHS' reason for firing plaintiff was in fact due to his continual noncompliance with company policy.

Plaintiff further argues that the timing of his firing shows that defendants' reasons for firing plaintiff were pretextual. Plaintiff first argues that from the time of his official reprimand until the date of his firing, there were no instances of further misconduct recorded. Additionally, plaintiff highlights that fact that defendants fired plaintiff shortly after he made his second accommodation request.

This evidence also is insufficient to rebut defendants legitimate, nondiscriminatory reasons for firing plaintiff. In fact, the timing of plaintiff's firing is consistent with defendants' argument that his act of gross insubordination on February 21, 1997, combined with his continual violation of company policy, lead to defendants' decision to terminate plaintiff's employment. As described above, the evidence shows that defendants consistently expressed concern over plaintiff's violation of company policy and procedures. The incident on February 21 was viewed by PNHS as the culmination of plaintiff's misconduct which both predated and coincided with plaintiff's disability. After discussing plaintiff's em-

ployment status with various PNHS employees and informing plaintiff that he was under review and just short of termination, Hawkins officially terminated plaintiff for the same reasons which defendants raised throughout his employment. Contrary to plaintiff's suggestion, the timing and circumstances of plaintiff's termination do not undermine defendants' proffered reasons. Thus, plaintiff has presented insufficient evidence that would allow a factfinder to reasonably infer that both of PNHS' proffered legitimate reasons for his termination were pretextual.

### D. Individual Liability under the PHRA.

Plaintiff has asserted a claim under the PHRA [14] against Hawkins, as an individual employee of PNHS. Generally, the PHRA is applied in accordance with Title VII. *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir.1996). Like Title VII, section 955(a) of the PHRA establish liability solely for employers and not individual employees. *Id.* However, a different section of the PHRA goes further than Title VII and contemplates accomplice liability for individual employees who aid and abet a section 955(a) violation by their employer. *Id.* (*citing* 43 Pa. Stat. § 955(e)). Thus, Hawkins may be liable under the ADA if he aided and abetted the unlawful discriminatory practices of PNHS. *See Glickstein v. Neshaminy Sch. Dist.*, No. 96–6236, 1997 WL 660636, at *12 (E.D.Pa. Oct.22, 1997) (concluding that a supervisory employee who engages in discriminatory conduct while acting in the scope of his employment shares the intent and purpose if the employer and may be held liable for aiding and abetting the employer in its unlawful act). However, since the court has granted summary judgment on plaintiff's claim of unlawful discrimination against PNHS, plaintiff's claim against Hawkins under the PHRA also fails.

14. Hawkins also moved for summary judgment on any claim under the ADA asserted against him as an individual employee of PNHS. The court will not address this issue since plaintiff maintains that he has never asserted a claim against Hawkins under the ADA. *See* Pl.'s Mot. for Summ. J. at 3, n. 1.

## V. CONCLUSION

Plaintiff has not raised a genuine issue of material fact concerning whether defendants granted both of plaintiff's request for accommodation. In addition, after defendants satisfied its burden of production by articulating legitimate, nondiscriminatory reasons for terminating plaintiff, the plaintiff has failed to satisfy his burden of showing that the legitimate, nondiscriminatory reasons offered by the defendants were not its true reasons, but were a pretext for discrimination. Lastly, since the court has entered judgment against plaintiff on his claim of unlawful discrimination against PNHS, plaintiff's claim against Hawkins under the PHRA for aiding and abetting an unlawful act of discrimination must also fail. Therefore, the court will grant summary judgment in favor of all defendants on all claims.

An appropriate order follows.

### ORDER

**AND NOW,** this 21st day of **October, 1999,** upon consideration of defendants PNHS and Bernard Hawkins' motion for summary judgment (doc. no. 20) and plaintiff's response thereto (doc. nos. 23 & 25), it is hereby **ORDERED** that:

1. Defendants' motion for summary judgment is **GRANTED;** and

2. **JUDGMENT** is **ENTERED** in favor of defendants and against plaintiff.

The clerk shall mark this case **CLOSED.**

**AND IT IS SO ORDERED.**